WOODRUFF, SPRADLIN & SMART, APC
DANIEL K. SPRADLIN – State Bar No. 82950
dspradlin@wss-law.com
M. LOIS BOBAK – State Bar No. 127540
lbobak@wss-law.com
ANNA R. SALUSKY – State Bar No. 222484
asalusky@wss-law.com
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone:  (714) 558-7000
Facsimile:  (714) 835-7787

Attorneys for Defendants CITY OF BEVERLY HILLS, DANIEL
CHILSON, MICHAEL PUBLICKER, CHIEF DAVID L.
SNOWDEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY KLEIN,<br><br>              Plaintiff,<br><br>v.<br><br>CITY OF BEVERLY HILLS, DANIEL CHILSON, MICHAEL PUBLICKER, CHIEF DAVID L. SNOWDEN, and DOES 1 through 10, inclusive,<br><br>              Defendants. | CASE NO: CV13-00110 JFW (VBKx)<br><br>BEFORE THE HONORABLE JOHN F. WALTER COURTROOM 16<br><br>**COMBINED STATEMENT OF FACTS**<br><br>HEARING DATES PENDING:<br>Type:   Motion for Summary Judgment<br>Date:   August 10, 2015<br>Time:   1:30 p.m.<br><br>Type:   Pre-Trial Conference<br>Date:   September 18, 2015<br>Time:   10:00 a.m.<br><br>Type:   Jury Trial<br>Date:   October 6, 2015<br>Time:   8:30 a.m. |

Defendants CITY OF BEVERLY HILLS, DANIEL CHILSON, MICHAEL

PUBLICKER, CHIEF DAVID L. SNOWDEN ("Defendants") submit this "Combined

Statement of Facts" in accordance with this Court's Scheduling and Case

Management Order, paragraph 4(a).  This Combined Statement of Facts has been

created using the Word version of "Plaintiff's Statement of Genuine Issues of Material

Fact and Statement of Additional Material Facts in Opposition to Defendants' Motion

1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

for Summary Judgment," which was emailed to defense counsel by Plaintiff's counsel.

## STATEMENT OF UNDISPUTED MATERIALS FACTS

| DEFENDANTS' UNDISPUTED MATERIAL FACTS | DEFENDANTS' SUPPORTING EVIDENCE AND PLAINTIFF'S RESPONSE |
|---|---|
| 1.     Rina Klein ("Rina") died at the age of 41 on May 31, 2009, from a seizure. | 1.     First Amended Complaint, 58:6-24. (¶8, 9), attached as Exhibit 28. (All page numbers refer to the sequential page numbering of the Compendium of Evidence)<br><br>**Plaintiff's Response:** Undisputed. |
| 2.     After she was brought to the hospital, Rina was received dialysis, a form of renal replacement therapy. | 2.     Partial transcript of interview with C. Miller, M.D. on October 12, 2010, 33:13-34:5, attached as Exhibit 6; Audio recording of interview with C. Miller, M.D., on October 12, 2010, 14:46-15:55 attached as Exhibit 1.   (All numbering relating to the audio recordings herein indicate minutes and seconds)<br><br>**Plaintiff's Response:**     Partially Disputed.  Rina Klein received continual renal therapy, not traditional kidney dialysis.   See Partial transcript of interview with C. Miller, M.D. on October 12, 2010, 10:7-10:24, attached as Exhibit 6. |

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

| | |
|---|---|
| 3.  Dr. Edward Feldman was a long-time family friend and one-time doctor of Rina's. | 3.  Partial transcript of July 3, 2009 interview of E. Feldman, M.D., 8:14-27, 11: 28-12:4, attached as Exhibit 2. **Plaintiff's Response:** Undisputed. |
| 4.  In approximately July 2009, then-Beverly Hills Police Department Chief David Snowden received a phone call from an individual claiming to know Dr. Feldman.  The caller reported Dr. Feldman was concerned that Rina Klein's death was suspicious. | 4.  Declaration of D. Snowden, ¶13, 4:3-5. **Plaintiff's Response:** Partially disputed. The individual that contacted Chief David Snowden was a former FBI agent who was a friend of Chief David Snowden.  *See* Plaintiff's Deposition Excerpt of Daniel Chilson, Page 6, Lines 4-8, 74:15-20. |
| 5.  Chief Snowden took down the contact information provided and forwarded it to a District Commander for further action. | 5.  Declaration of D. Snowden, ¶13, 4:5-7. **Plaintiff's Response:** Undisputed. |
| 6.  On July 2, 2009 Detective Sergeant Michael Publicker assigned Detective Daniel Chilson to investigate the circumstances of Rina's death. | 6.  Declaration of D. Chilson, ¶6, 2:10-16. **Plaintiff's Response:** Undisputed. |
| 7.  Detective Chilson interviewed Dr. Feldman on July 3, 2009. | 7.  Declaration of D. Chilson, ¶8, 2:21. **Plaintiff's Response:** Undisputed. |
| 8.  During the July 3, 2009 interview, Dr. Feldman told Detective Chilson he "had counseled them [the Kleins] at least once in my house when they were having | 8.  Partial transcript of interview of E. Feldman, M.D., on July 3, 2009, 10:1-23, attached as Exhibit 2; Audio recording of interview with E. Feldman, |

1102215.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| some marital… 'difficulties' on a philosophic basis. [Gary Klein] becomes religious and controlling." | M.D., on July 3, 2009, attached as Exhibit 1.<br><br>**Plaintiff's Response:** Undisputed. |
| 9.    During the July 3, 2009 interview, Dr. Feldman described Gary Klein to Detective Chilson as "very overbearing and controlling." | 9.    Partial transcript of interview with E. Feldman, M.D., on July 3, 2009, 4:14, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1.<br><br>**Plaintiff's Response:** Disputed. Klein was never "very overbearing and controlling". *See* Plaintiff's Deposition Excerpt of Gary Klein, Page 3, Lines 9-26 through Page 4, Lines 1-3; 181:12 to 182:17-17 (And I drove with my father and my children and Rina, and if I wasn't driving, Rina was taking the kids to a bat mitzvah or bar mitzvah or anything that was religious.  That's the rules of conservative Judaism. Reformed Judaism goes even farther and drives everywhere.  But to suggest that I'm controlling because Rina and I agreed to this is just, again, a misrepresentation of the facts and makes me look like a terrible person.  I'm not."). |
| 10.    During the July 3, 2009 interview, Dr. Feldman stated that Julie Pakula (Rina Klein's mother) informed him that | 10.    Partial transcript of interview with E. Feldman, M.D., on July 3, 2009, 9:17-10:3, attached as Exhibit 2; Audio |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| "Rina Klein was seeking a divorce and they had gone to a divorce attorney." | recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1. <br><br> **Plaintiff's Response:** Disputed. Klein denies that they had gone to a divorce attorney prior to Rina Klein's death. *See* Deposition Excerpt of Gary Klein, 102:24-103:12. (Q. In that eight months to a year prior to Rina's death, did she ever discuss divorce with you? A. No. We were looking for a new house. We decided that a new house was not going to be something in the budget. We then did the refinance with Quicken Loans. We were looking forward to going back to Santa Barbara, this time with the kids. There was never ever a discussion about divorce, and that was confirmed by Marty Nizlik, Rina's therapist".) |
| 13.   During the July 3, 2009 interview, Dr. Feldman told Detective Chilson "Gary did all that he could to see to it that there was no autopsy done" and that Gary did not "want Rina's body cut up." | 13.   Partial transcript of interview with E. Feldman on July 3, 2009, 19:25-20:10, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1. <br><br> **Plaintiff's Response:** Disputed. Klein "very strongly wanted a full autopsy" and it was his and Rina Klein's Rabbi, |

Rabbi Steven Weil that instructed Klein and the Los Angeles County Coroner to perform a Class "D" Autopsy. *See* Plaintiff's Exh. 42, Transcript of Daniel Chilson's (DC) interview with Rabbi Steven Weil (SW), Dated August 13, 2009, 1:10-15.

("SW: Um on that case and Gary originally, very strongly wanted a full autopsy and I was the one that pushed him. I'm his rabbi, I was Rina's rabbi. You know in Jewish law I said, look by just taking, extracting seminal fluids you know in his blood, urine, hypothalamus glands, and we've worked with Dr. Lakshmanan and with the LA County Coroner's office so many times. In fact I called up Rabbi Goldenberg after asking Gary to do it that way.

DC:   Okay.

SW:   That's why we asked for the limited autopsy. I take full responsibility.

DC:   Okay.

SW:   And you know, you know, I will, please feel free if you want I can share to you face to face. I, you can see that I'm telling and sincere about that.

DC:   No, I get.

6

1102215.1

SW:  In that, Chief of Police Snowden knows me very well. Now, you know, his, you know what, what her family is doing, okay you know I'm not here to sit and judge them.  But, you know, to even think for a second that Gary was trying to hide something by not asking for a full autopsy, I take full responsibility of that.

DC:  Okay.

SW:  110 percent. Because I can tell you, I could testify in a court of law, I know what his original intentions are and it took over about a 36-hour period.  I said, look Gary is this what we want to do to her.  You know, she suffered enough.  You know, again if Dr. Lakshmanan's office feels it's a full autopsy is necessary, it doesn't matter what I say as the rabbi they're gonna do it. And you know, we have the respect for them."

*See* Plaintiff's Deposition Excerpts of Daniel Chilson, Pages 10, Lines 3-26, 93:15-94:22; Page 11, Lines 1-10, 95:7-21; Page 12, Lines 4-26, 97:20-98:23; and Page 13, Lines 1-20, 99:3-25.

*See* Defendant's Exh. 8, Page 53, Para. 7

1102215.1

| | |
|---|---|
| 14.    During the July 3, 2009 interview, Dr. Feldman said that Gary Klein's doctor, Allan Metzger, came to the hospital before Rina Klein died. | 14.    Partial transcript of interview with E. Feldman on July 3, 2009, 7:20-27, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1. **Plaintiff's Response:** Undisputed. |
| 15.    During the July 3, 2009 interview Dr. Feldman stated Dr. Metzger "prescribes inappropriately", that he was a "free and easy prescription writer", and that a friend of Dr. Feldman's wife, who was a patient of Dr. Metzger's, had died of an overdose. | 15.    Partial transcript of interview with E. Feldman on July 3, 2009, 6:10-7:18, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1. **Plaintiff's Response:** Undisputed. |
| 16.    Subsequent to the July 3, 2009 interview with Dr. Feldman, Detective Chilson obtained records from the California Medical Board verifying that Dr. Metzger had been formally reprimanded. | 16.    Declaration of D. Chilson, ¶9, 2:21-23. **Plaintiff's Response:** Undisputed. |
| 17.    During the July 3, 2009 interview, Dr. Feldman stated Julie Pakula had removed Rina Klein's prescription bottles from the home, an act which had Gary Klein "very angry", so "irate" that he would not allow the maternal grandparents to see the children until the medications were returned with a letter of apology. | 17.    Partial transcript of interview with E. Feldman on July 3, 2009, 5:8-13, 15:13-16:4, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1. **Plaintiff's Response:** Undisputed. |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| 18. Detective Chilson interviewed Anita Pakula, Rina Klein's sister, on July 3, 2009. | 18. Declaration of D. Chilson, ¶10, 3:24. |
|---|---|
| | **Plaintiff's Response:** Undisputed. |
| 19. During the July 3, 2009 interview, Anita Pakula told Detective Chilson her sister's marriage was "very bad" and that Gary Klein was "very controlling." | 19. Partial Transcript of Anita Pakula on July 3, 2009, 26:4-6, attached as Exhibit 4; Audio Recording of Interview of Anita Pakula on July 3, 2009, 7:33-7:45, attached as Exhibit 1. |
| | **Plaintiff's Response:** Undisputed. |
| 20. During the July 3, 2009 interview, Anita Pakula said that Gary Klein had threatened Rina Klein that if she left him, "she would never see the kids again", and threatened "he would make it possible for if she died that no one would know about it. | 20. Partial transcript of Anita Pakula on July 3, 2009, 26:7-11, attached as Exhibit 4; Audio Recording of Interview of Anita Pakula on July 3, 2009, 7:46-8:12, attached as Exhibit 1. |
| | **Plaintiff's Response:** Partially Disputed. Detective Chilson testified that he did not find it suspicious that Anita Pakula failed report Klein's alleged 'death threat' to Rina Klein's physicians while she was in the intensive care unit at Cedars Sinai Medical Center. *See* Plaintiff's Deposition Excerpts of Daniel Chilson, Page 15, Lines 21-26 through Page 16, Line 1-3, 104:3-14. ("Q. And Anita Pakula is a medical doctor, isn't she? A. Yes. Q. And did you consider that |

1102215.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | noteworthy to your investigation, that a medical doctor failed to report a death threat about her sister to the treating physicians at Cedars? |
| | A.    No. |
| | Q.    Did you find it suspicious as to the credibility of Julie Pakula that she only told you about this weeks after her daughter's death? |
| | A.    No." |
| 21.    During the July 3, 2009 interview, Anita Pakula also told Detective Chilson her sister "had been in a divorce attorney's office within the two weeks prior to her death." | 21.    Partial transcript of Anita Pakula on July 3, 2009, 26:12-23, attached as Exhibit 4; Audio Recording of Interview of Anita Pakula on July 3, 2009, 8:13-9:13, attached as Exhibit 1. |
| | **Plaintiff's Response:**  Disputed. Klein denies Rina and Klein had gone to a divorce attorney prior to Rina Klein's death. *See* Plaintiff's Deposition Excerpt Gary Klein, 102:24-103:12. |
| | (Q.    In that eight months to a year prior to Rina's death, did she ever discuss divorce with you? |
| | A.    No.  We were looking for a new house. We decided that a new house was not going to be something in the budget. We then did the refinance with Quicken Loans.   We were looking forward to |

1102215.1

| | |
|---|---|
| | going back to Santa Barbara, this time with the kids.  There was never ever a discussion about divorce, and that was confirmed by Marty Nizlik, Rina's therapist".) |
| 22.    During the July 3, 2009 interview, Anita Pakula also told Detective Chilson that Gary Klein "was very insistent because of his religious beliefs that there would be no autopsy." | 22.    Partial transcript of interview with E. Feldman on July 3, 2009, 19:25-20:10, attached as Exhibit 2; Audio recording of interview with E. Feldman, M.D., on July 3, 2009, attached as Exhibit 1.<br><br>**Plaintiff's Response:**  Disputed. Klein "very strongly wanted a full autopsy" and it was his and Rina Klein's Rabbi, Rabbi Steven Weil that instructed Klein and the Los Angeles County Coroner to perform a Class "D" Autopsy.<br><br>*See* Plaintiff's Exh. 42, Transcript of Daniel Chilson's (DC) interview with Rabbi Steven Weil (SW), Dated August 13, 2009, 1:10-15.<br><br>("SW: Um on that case and Gary originally, very strongly wanted a full autopsy and I was the one that pushed him. I'm his rabbi, I was Rina's rabbi. You know in Jewish law I said, look by just taking, extracting seminal fluids you know in his blood, urine, hypothalamus |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

glands, and we've worked with Dr. Lakshmanan and with the LA County Coroner's office so many times. In fact I called up Rabbi Goldenberg after asking Gary to do it that way.

DC:   Okay.

SW:   That's why we asked for the limited autopsy. I take full responsibility.

DC:   Okay.

SW:   And you know, you know, I will, please feel free if you want I can share to you face to face. I, you can see that I'm telling and sincere about that.

DC:   No, I get.

SW:   In that, Chief of Police Snowden knows me very well. Now, you know, his, you know what, what her family is doing, okay you know I'm not here to sit and judge them.  But, you know, to even think for a second that Gary was trying to hide something by not asking for a full autopsy, I take *full responsibility* of that.

DC:   Okay.

SW:   *110 percent*. Because I can tell you, I could testify in a court of law, I know what his original intentions are and it took over about a 36-hour period.  I

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | said, look Gary is this what we want to do to her.   You know, she suffered enough.   You know, again if Dr. Lakshmanan's office feels it's a full autopsy is necessary, it doesn't matter what I say as the rabbi they're gonna do it. And you know, we have the respect for them."<br><br>*See* Plaintiff's Deposition Excerpts of Daniel Chilson, 93:15-94:22; 95:7-21; 97:20-98:23; and 99:3-25.<br><br>*See* Plaintiff's Defendant's Exh. 8, Page 53, Para. 7 |
| 23.    Helene   Klein,   Klein's   sister, observed Klein get on his hands and knees while Rina was in the hospital and ask "Anita to help him not have her body cut up." | 23.    Deposition of Helene Klein taken on June 24, 2015, 56:2-8, attached as Exhibit 21.<br><br>**Plaintiff's Response:**   Disputed. Klein "very strongly wanted a full autopsy" and it was his and Rina Klein's Rabbi, Rabbi Steven Weil that instructed Klein and the Los Angeles County Coroner to perform a Class "D" Autopsy.<br><br>*See* Plaintiff's Exh. 42, Transcript of Daniel Chilson's (DC) interview with Rabbi Steven Weil (SW), Dated August 13, 2009, 1:10-15.<br><br>("SW: Um on that case and Gary originally, very strongly wanted a full |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | autopsy and I was the one that pushed him. I'm his rabbi, I was Rina's rabbi. You know in Jewish law I said, look by just taking, extracting seminal fluids you know in his blood, urine, hypothalamus glands, and we've worked with Dr. Lakshmanan and with the LA County Coroner's office so many times. In fact I called up Rabbi Goldenberg after asking Gary to do it that way. |
| 24.    Detective Chilson interviewed Rina's mother, Julie Pakula, on July 15, 2009. | 24.    Declaration of D. Chilson, ¶11, 4:6-9.<br>**Plaintiff's Response:** Undisputed. |
| 25.    During the July 15, 2009 interview, Julie Pakula told Detective Chilson that Rina was advised by Klein to go on Wellbutrin because "they were fighting constantly." | 25.    Partial transcript of interview of Julie Pakula on July 15, 2009, 31:12-24, attached as Exhibit 5; Audio recording of Interview of Julie Pakula on July 15, 2009, 39:58-40:39, attached as Exhibit 1.<br>**Plaintiff's Response:** Disputed. Klein had not had any arguments with Rina Klein in the week leading up to Rina Klein's death and they were in a "happiest place" in their marriage.<br>*See* Plaintiff's Deposition Excerpt of Gary Klein, 101:18-102:13.<br>("Q. Had the two of you had any arguments in the week leading up to Rina going to the hospital? |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | A.   Rina and I? |
| | Q.   Correct. |
| | A.   Rina and I had come to the happiest place we had ever been together. And, no, there was -- I was coming home, I recall that I had been -- I was the happiest we had ever been, that Rina was staying away from her in-laws -- I'm sorry, my in-laws, her parents, and we were getting along superbly.  No, we had no disagreement. Went to a family wedding on Sunday, May 24th, and we danced and we ate and we had a lot of good times, a lot of fun. |
| | Q.   At any point within two weeks prior to her death, did the two of you have an argument where you told her to leave the house and that you didn't like her anymore? |
| | A.   No, absolutely not. |
| | Q.   What about within a month of her death, did you ever make those statements to her? |
| | A.   Never." |
| 26.   During the July 15, 2009 interview, Julie Pakula also stated that Rina had "seen some lawyer about a divorce." | 26.   Partial transcript of interview of Julie Pakula on July 15, 2009, 28:25-29:14, attached as Exhibit 5; Audio recording of Interview of Julie Pakula on |

1102215.1

July 15, 2009, 25:39-26:41, attached as Exhibit 1.

**Plaintiff's Response:** Disputed. Klein denies Rina and Klein had gone to a divorce attorney prior to Rina Klein's death. *See* Deposition Excerpt of Gary Klein, 102:24-103:12.

(Q.    In that eight months to a year prior to Rina's death, did she ever discuss divorce with you?

A.    No.  We were looking for a new house. We decided that a new house was not going to be something in the budget. We then did the refinance with Quicken Loans.  We were looking forward to going back to Santa Barbara, this time with the kids.  There was never ever a discussion about divorce, and that was confirmed by Marty Nizlik, Rina's therapist".)

| | |
|---|---|
| 27.    During the July 15, 2009 interview, Julie Pakula also told Detective Chilson her daughter had been threatened by Klein, who said "if he wanted to get rid of her, he'd just do it and no one would know how she died." | 27.    Partial transcript of interview of Julie Pakula on July 15, 2009, 30:13-20, attached as Exhibit 5; Audio recording of Interview of Julie Pakula on July 15, 2009, 32:40-33:23, attached as Exhibit 1.<br><br>**Plaintiff's Response:**   Disputed. Julie Pakula, Rina Klein's mother never anyone of the alleged 'death threat' until |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | weeks after Rina Klein's death. |
| | *See* Deposition Excerpts of Daniel Chilson, 104:3-14. |
| | Q.    And did you consider that noteworthy to your investigation, that a medical doctor failed to report a death threat about her sister to the treating physicians at Cedars? |
| | A.    No. |
| | Q.    Did you find it suspicious as to the credibility of Julie Pakula that she only told you about this weeks after her daughter's death? |
| | A.    No." |
| 28.    Detective Chilson obtained a warrant to search the Klein residence. | 28.    Declaration of D. Chilson, ¶13, 5:5-13; August 3, 2009 Search Warrant and Affidavit, 41-45, 46-55, attached as Exhibit 8.<br>**Plaintiff's Response:** Undisputed. |
| 29.    The first search of the Klein home was conducted on August 3, 2009. | 29.    Declaration of D. Chilson, ¶13, 5:6; August 3, 2009 Search Warrant and Affidavit, 41-45, 46-55, attached as Exhibit 8.<br>**Plaintiff's Response:** Undisputed. |
| 30.    The purpose of the August 2009 search of the Klein home was to look generally for any evidence that Rina Klein was poisoned. | 30.    Declaration of D. Chilson, ¶13, 5:6-8; August 3, 2009 Search Warrant and Affidavit, pp. 54-55, attached as Exhibit 8. |

1102215.1

| | |
|---|---|
| | **Plaintiff's Response:** Undisputed. |
| 31.    Detective Sergeant Publicker and Detective Chilson were both present for the August 2009 search. | 31.    Declaration of D. Chilson, ¶13, 5:5-13. |
| | **Plaintiff's Response:** Undisputed. |
| 32.    (*Misidentified by Plaintiff as No. 33*) Rina's remains were exhumed on August 4, 2009. | 32.    Declaration of D. Chilson, ¶14, 5:14-15. |
| | **Plaintiff's Response:** Undisputed. |
| 33.    (*Misidentified by Plaintiff as No. 35*) The Coroner changed the cause of death from "natural causes" to "inconclusive." | 33.    Class D Autopsy Examination Report, p. 75, attached as Exhibit 9, p. 75; Class A Autopsy Examination Report, pp. 78, 84, attached as Exhibit 10.<br><br>**Plaintiff's Response:** Partially Disputed. The Los Angeles County Coroner changed the cause of death to *"COULD NOT BE DETERMINED"*, See Class A Autopsy Opinion, p. 85, attached as Exhibit 10. |
| 34.    (*Misidentified by Plaintiff as No. 36*) An independent laboratory that conducted toxicology testing on sample from Rina's liver detected strychnine, but the results could not be duplicated. | 34.    July 2011 Search Warrant Affidavit, p. 102:26-29, attached as Exhibit 11.<br><br>**Plaintiff's Response:**   Disputed. The independent laboratory, the National Medical Service (NMS) Lab never detected the presence of strychnine in Rina Klein's liver bile or anywhere else. In fact, the NMS test that Defendants are referring to was a 'false-positive' which |

is not a valid identifier of strychnine. Further, there was no way to 'duplicate' a 'false-positive' for strychnine.

*See* Plaintiff's Exh. 45, pp. 86-87

On 11/19/2010, the Los Angeles County Coroner's Office performed it's own tests for strychnine of Rina Klein's Liver, Gastric, Bile and Muscle from the Class "A" homicide autopsy. No strychnine was detected using more sensitive tests than the NMS. The Coroner was concerned when Det. Chilson told them that the NMS lab found strychnine. On 11/19/2010, in response to Det. Chilson's allegation that NMS found strychnine, the Coroner called the NMS lab and spoke to the Dr. Adams that allegedly the found strychnine. The Coroner spoke with Dr. Adams and informed her that the Coroner ran several tests and they all came back negative for strychnine and it concerned the Coroner that the somehow NMS found strychnine. Dr. Adams of the NMS indicated to the Coroner "that NMS was '*not really sure*' of their findings of strychnine and they "needed to do more work". However, later that

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

19

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | day Det. Chilson called the Coroner again and claimed that the NMS did find strychnine (which turned out false). *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 221 that confirms no strychnine was ever found in Rina Klein. On 11-30-2010, Det. Chilson called the Coroner and he provided an additional toxicology report with "Strychnine being reported Not detected." *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 221. |
|---|---|
| 35.   (*Misidentified by Plaintiff as No. 37*) The investigation of the death of Rina Klein was the first homicide investigation in which Detective Chilson was the lead investigating officer. | 35.   Declaration of D. Chilson, ¶4, 1:25-26. **Plaintiff's Response:** Undisputed. |
| 36.   (*Misidentified by Plaintiff as No. 38*) Over the course of the investigation Detective Chilson obtained evidence corroborating Rina's interest in a possible divorce, including information in Rina's cell phone with contacts for divorce attorneys. | 36.   Declaration of D. Chilson, ¶12, 4:21, 5:4. **Plaintiff's Response:** Undisputed. |
| 37.   (*Misidentified by Plaintiff as No. 39*) Detective Chilson found email between Rina and her estate planning | 37.   Declaration of D. Chilson, ¶12, 4:21, 5:4. **Plaintiff's Response:** Undisputed. |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| attorney Diedre Wachbrit Braverman in which Rina was referred to a divorce attorney, and saw handwritten entries in Rina's day planner regarding that referral. | |
| 38.   (*Misidentified by Plaintiff as No. 40*) David Parker, Rina Klein's former employer, told Detective Chilson that he Parker referred Rina to a divorce attorney after she told him of her desire for a divorce because she was "unhappy and felt trapped." | 38.   Declaration of D. Chilson, ¶12, 4:28-5:1; Partial transcript of Oct 2, 2009 interview of D. Parker, 35:24-36:1, 37:14-40:10, attached as Exhibit 7; Audio Recording of Interview of D. Parker on October 2, 2009, 1:02-1:27 and 4:38-12:04, attached as Exhibit 1.<br><br>**Plaintiff's Response:**   Undisputed. Objection: Hearsay. Fed. R. Evid. 801.<br>Plaintiff is quoting an out of court statement (she (Rina) was "unhappy and felt trapped.") |
| 39.   (*Misidentified by Plaintiff as No. 41*)   Detective Chilson interviewed attorney Karen Silver, who described Rina Klein as "unhappy" in her marriage and confirmed that Rina had approached her about a possible divorce shortly before her death. | 39.   Declaration of D. Chilson, ¶12, 5:1-2; attached as Exhibit 3;   Partial transcript of May 4, 2010 interview of Karen Silver, 22:6-27, 23:5-21, attached as   Exhibit   3;   Audio   recording   of interview with K. Silver, 1:22-2:21 and 2:41-3:37,   attached   as   Exhibit   1; Declaration of K. Silver, ¶3, 625:26-626:1, attached as Exhibit 31.<br><br>**Plaintiff's Response:**   Undisputed. Objection: Hearsay. Fed. R. Evid. 801. |

| | |
|---|---|
| | Plaintiff is quoting an out of court statement (she (Rina) was "unhappy and felt trapped.") |
| 40.    (*Misidentified by Plaintiff as No. 42*) In early 2011, Detective Chilson requested and received approval to have Homicide Detective Mark Lillienfeld of the Los Angeles County Sheriff's Department assist with the investigation. | 40.    Declaration of D. Chilson, ¶15, 5:20-26; Declaration of D. Snowden, ¶17, 5:12-14; Declaration of M. Lillienfeld, ¶9, 2:22-27. **Plaintiff's Response:** Undisputed. |
| 41.    (*Misidentified by Plaintiff as No. 43*) Detective Lillienfeld has investigated hundreds of homicides and frequently lectures on the subject. | 41.    Declaration of M. Lillienfeld, ¶¶ 2-4, 1:9-2:1. **Plaintiff's Response:** Undisputed. |
| 42.    (*Misidentified by Plaintiff as No. 44*) Gary Klein's brother, Avram, and his parents, Rose and Alex, were interviewed by Detective Lillienfeld and his partner, John O'Brien, on March 31, 2011; Detective Chilson and Detective Sergeant Publicker were not present. | 42.    Declaration of M. Lillienfeld, ¶16, 4:14-21; Audio recording of interview of Avram Klein on March 31, 2011, attached as Exhibit 1. **Plaintiff's Response:** Undisputed. |
| 43.    (*Misidentified by Plaintiff as No. 45*) A second interview of Avram Klein was conducted by Detectives Chilson and Lillienfeld on June 15, 2011; Rose and Alex were present but did not participate. | 43.    Declaration of M. Lillienfeld, ¶17, 4:22-26, Audio recording of interview of Avram Klein on June 15, 2011, attached as Exhibit 1. **Plaintiff's Response:** Undisputed. |
| 44.    (*Misidentified by Plaintiff as No. 46*)    Avram    was    interviewed    by | 44.    Declaration of M. Lillienfeld, ¶18, 4:27-5:2, Audio recording of interview |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| Detectives Lillienfeld, O'Brien, and Chilson on June 30, 2011 at Mort's Deli. | of Avram Klein on June 30, 2011, attached as Exhibit 1.<br><br>**Plaintiff's Response:** Undisputed. |
| 45.    (*Misidentified by Plaintiff as No. 47*) On June 7, 2011 the Klein's two oldest children, J.K. and T.K., were interviewed by Sheriff's Department Deputy Anna Tapia. | 45.    Declaration of D. Chilson, ¶24, 9:6-10; Declaration of M. Lillienfeld, ¶15,   4:3-13;   Audio   recording   of interview of J.K. and T.K. on June 7, 2011, attached as Exhibit 1; Depo of T.K. at 454:7-10, attached as Exhibit 23; Depo of J.K. at 436:14-19, attached as Exhibit 22.<br><br>**Plaintiff's Response:** Undisputed. |
| 46.    (*Misidentified by Plaintiff as No. 48*)   The   children   were   interviewed separately for less than half an hour each. | 46.    Audio recording of interview of J.K. and T.K. on June 7, 2011, attached as Exhibit 1; Depo of T.K. at 461:12-14, attached as Exhibit 23; Depo of J.K. at 436:24-437:2, attached as Exhibit 22.<br><br>**Plaintiff's Response:** Undisputed. |
| 47.    (*Misidentified by Plaintiff as No. 49*) Deputy Tapia is specially trained to handle sensitive interrogations, had over a decade of experience in the field, and had conducted hundreds of interviews with children. | 47.    Declaration of M. Lillienfeld, ¶15, 4:3-13.<br><br>**Plaintiff's Response:** Undisputed. |
| 48.    (*Misidentified by Plaintiff as No. 50*) Deputy Tapia was nice and polite to both of the Klein children during the interviews. | 48.    Depo   of   T.K.,   459:24-460:5, attached as Exhibit 23; Depo of J.K., 437:16-24, attached as Exhibit 22.<br><br>**Plaintiff's Response:** Undisputed. |

1102215.1

| | |
|---|---|
| 49.   (*Misidentified by Plaintiff as No. 51*) J.K. testified that the investigation had no impact on his relationship with his father, and that no other children in his class were aware of the interview. | 49.   Depo of J.K., 435:8-25; 436:14-19; 438:21-439:4; 443:10-12, attached as Exhibit 22.<br><br>**Plaintiff's Response:**  Undisputed. |
| 50.   (*Misidentified by Plaintiff as No. 52*) T.K. testified that the investigation had no impact on his relationship with his father, and that he was not in his classroom when the Principal escorted him to meet with the Detectives. | 50.   Deposition of T.K., 455:3-5; 455:25-456:12; 457:19-21, attached as Exhibit 23.<br><br>**Plaintiff's Response:**  Undisputed. |
| 51.   (*Misidentified by Plaintiff as No. 53*) Gary Klein's sister Helene was interviewed on August 4, 2009 by Detective Chilson and Detective Sergeant Publicker. | 51.   Declaration of D. Chilson, ¶25, 9:17-18, Audio recording of interview with H. Klein on August 4, 2009, attached as Exhibit 1.<br><br>**Plaintiff's Response:**  Undisputed. |
| 52.   (*Misidentified by Plaintiff as No. 54*) Helene Klein described the officers' conduct at all times as "polite." | 52.   Depo of H. Klein, 416:17-417:12, attached as Exhibit 21.<br><br>**Plaintiff's Response:**  Undisputed. |
| 53.   (*Misidentified by Plaintiff as No. 55*) Helene Klein's interview with the detectives did not change her relationship with Klein. | 53.   Depo of G. Klein, 486:25-492:25, attached as Exhibit 24.<br><br>**Plaintiff's Response:**  Undisputed. |
| 54.   (*Misidentified by Plaintiff as No. 56*) Avram Klein admitted that the investigation had no adverse effect on his relationship with Gary Klein.<br>/// | 54.   Depo of A. Klein, 511:19-23; 518:16-20, attached as Exhibit 25.<br><br>**Plaintiff's Response:**  Undisputed. |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

| 55.   (*Misidentified by Plaintiff as No. 57*) Avram Klein described the officers' conduct at all times as "polite." | 55.   Depo of A. Klein, 507:10-508:4, attached as Exhibit 25. **Plaintiff's Response:**  Undisputed. |
| --- | --- |
| 56.   (*Misidentified by Plaintiff as No. 58*) Sandy Klein was never interviewed. Detective Chilson left a business card for her, but never heard back from her. | 56.   Declaration of D. Chilson, ¶ 27, 10:8-15. **Plaintiff's Response:**  Undisputed. |
| 57.   (*Misidentified by Plaintiff as No. 59*) Klein agreed that one of the purposes of a law enforcement agency is to investigate potential crimes. | 57.   Deposition of G. Klein, 144:22-25, attached as Exhibit 24. **Plaintiff's Response:**  Undisputed. |
| 58.   (*Misidentified by Plaintiff as No. 60*) Klein also agreed that it is appropriate to talk to family members when investigating a crime because "if there's a crime, [he thinks] they should do whatever they could to come to some conclusion." | 58.   Deposition of G. Klein, 146:22-147:22, attached as Exhibit 24. **Plaintiff's Response:**  Undisputed. |
| 59.   (*Misidentified by Plaintiff as No. 61*) Detective Chilson prepared a June 2011 affidavit in support of a warrant for a second search of the Klein residence, which was executed in July, 2011. | 59.   Declaration of D. Chilson, ¶ 17, 6:17-23;   July   2011   Warrant   and Affidavit,  87-90,  92-110,  attached  as Exhibit 11. **Plaintiff's Response:**  Undisputed. |
| 60.   (*Misidentified by Plaintiff as No. 62*) The purpose of the July 2011 search was more narrow than the first – to search and seize computers and other electronic devices, for medical records | 60.   Declaration of D. Chilson, ¶ 16, 5:27-6:16;   July   2011   Warrant   and Affidavit,  pp.  101-108,  attached  as Exhibit 11. **Plaintiff's Response:**  Undisputed. |

1102215.1

| | |
|---|---|
| and medications, and for correspondence between Gary Klein and certain individuals pertaining to allegedly perjured declarations. | |
| 61.   (*Misidentified by Plaintiff as No. 63*) Detectives Chilson, Lillienfeld and Publicker were present for the July 2011 search of the Klein home. | 61.   Declaration of M. Publicker, ¶23, 5:26-6:1.<br><br>**Plaintiff's Response:** Undisputed. |
| 62.   (*Misidentified by Plaintiff as No. 64*) Detective Chilson prepared a December 2011 affidavit in support of a warrant for a third search of the Klein residence, which was executed in December, 2011. | 62.   Declaration of D. Chilson, ¶19, 7:7-9; December 2011 Warrant and Affidavit, pp. 121-125, 126-139 attached as Exhibit 12.<br><br>**Plaintiff's Response:** Undisputed. |
| 63.   (*Misidentified by Plaintiff as No. 65*) The purpose the December 2011 search was to search and seize evidence of possible computer fraud. | 63.   Declaration of D. Chilson, ¶19, 7:9-13; December 2011 Warrant and Affidavit, 130:19-22, attached as Exhibit 12.<br><br>**Plaintiff's Response:** Undisputed. |
| 64.   (*Misidentified by Plaintiff as No. 66*) The December 2011 warrant authorized the search and seizure of computers and other electronic equipment that might contain evidence of computer fraud. | 64.   Declaration of D. Chilson, ¶19, 9-17; December 2011 Warrant and Affidavit, pp. 135:1-136:33, attached as Exhibit 12.<br><br>**Plaintiff's Response:** Undisputed. |
| 65.   (*Misidentified by Plaintiff as No. 67*) After Rina's death, Helene Klein gave Julie Pakula three pieces of Rina's | 65.   Depo of H. Klein, 419:5-421:15; 421:22-422:14; 423:17-424:18, attached as Exhibit 21. |

1102215.1

26

WOODRUFF, SPRADLIN & SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

| | |
|---|---|
| jewelry, including a heart shaped locket. Helene Klein had no reason to believe that Julie Pakula stole any of Rina's jewelry. | **Plaintiff's Response:** Undisputed. |
| 66. (*Misidentified by Plaintiff as No. 68*) This action was filed January 7, 2013. | 66. First Amended Complaint, attached as Exhibit 28. **Plaintiff's Response:** Undisputed. |
| 67. (*Misidentified by Plaintiff as No. 69*) It was stayed until September 2014 to allow completion of the homicide investigation and to allow the District Attorney time to consider possible charges. | 67. Declaration of A. Salusky, ¶5, 2:1-3. **Plaintiff's Response:** Undisputed. |
| 68. (*Misidentified by Plaintiff as No. 70*) The District Attorney has not filed criminal charges against Klein for murder, but has charged him with computer fraud. | 68. Declaration of D. Snowden, ¶16, 5:1-11. **Plaintiff's Response:** Undisputed. |
| 69. (*Misidentified by Plaintiff as No. 71*) Klein was served written interrogatories on May 6, 2015. After 31 days of agreed-upon extensions, unverified responses were served on July 6, 2015. | 69. July 13, 2015 Declaration of A. Salusky, ¶¶10-12, 2:18-3:15; Responses to Chilson's Special Interrogatories, attached as Exhibit 30; Responses to City's Special Interrogatories, attached as Exhibit 29. **Plaintiff's Response:** Undisputed. |
| 70. (*Misidentified by Plaintiff as No. 72*) The response to Chilson's Special Interrogatory No. 5 lists the alleged | 70. Responses to Chilson's Special Interrogatories, Nos. 5, 20, and 25, attached as Exhibit 30. |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| material misrepresentations and omissions pertinent to the August, 2009 search of Gary Klein's home. When asked for the material misrepresentations and omissions in the two 2011 warrant affidavits, no additional facts were cited, only a statement that there was no "probable cause because of the intentional judicial deception perpetrated by Chilson and Publicker" as set forth previously, presumably in response to Special Interrogatory No. 5. | **Plaintiff's Response:** Partially Disputed. At the time Plaintiff's responses to Defendants' interrogatories were prepared Plaintiff had not yet deposed Detective Chilson and reserved the right to supplement his responses after completion of the Defendants' depositions. *See* Responses to Chilson's Special Interrogatories, Nos. 5, Page 607, as Exhibit 30. |
| 71. (*Misidentified by Plaintiff as No. 73*) Gary Klein designated no experts, but in rebuttal identified a police practices expert, Roger Clark, who opined "Taking Mr. Klein's allegations as true, the defendant BHPD officers have deliberately and grossly misused their police authority to inflict significant unjustified harm and distress to Mr. Klein without the requisite probable cause." | 71. Declaration of A. Salusky, ¶19, 4:16-19; Roger Clark Report, p. 4, attached as Exhibit 26. <br><br> **Plaintiff's Response:** Undisputed. |
| 72. (*Misidentified by Plaintiff as No. 74*) Mr. Clark also states that he does "not make credibility determinations in expressing [his] opinions. That is, where there are differences in the events | 72. Clark Report, pp. 1-2, attached as Exhibit 26. <br><br> **Plaintiff's Response:** Disputed. Roger A. Clark, police practices expert, opined that since the deposition of Det. Chilson |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| proffered by the defendants versus those proffered by Mr. Klein, [he does] not opine for the trier of fact regarding who are the more believable witnesses." | had not been taken at the time he prepared his Rule 26 report, he needed to wait to see the deposition testimony of Det. Chilson to assess his creditability. Ultimately Mr. Clark was present during the deposition of Det. Chilson.<br><br>*See* Declaration of Roger A. Clark, Page 4, ¶¶ 9, 10, and 11. |
| 73.    (*Misidentified by Plaintiff as No. 75*) All California law enforcement agencies (including the BHPD) must comply with the requirements of the California Peace Officers Standards and Training Commission (P.O.S.T.), which mandates a minimum of 660 hours of basic training for police officers at the entry level; and 24 hours every two years of in-service training, 14 hours of which must be for "perishable skills" including tactics training.   By the time a peace officer rises through the ranks to the level of a homicide investigator, he or she will have undergone hundreds of additional hours of POST training, including POST training specifically tailored to proper witness interviewing technique, evidence handling, proper investigative approach, and skills | 73.    Declaration of D. Snowden, ¶19, 6:19-22; Declaration of E. Lee, ¶¶2-4, 1:14-28; Declaration of M. Lillienfeld, ¶12, 3:14-23.<br><br>**Plaintiff's Response:**  Undisputed. |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| specific to homicide investigations as well. | |
| 74. (*Misidentified by Plaintiff as No. 76*) The Beverly Hills Police Department had a variety of policies including topics such as obtaining search warrants, evidence handling and conduct with the public at large.  The Police Department, as a matter of policy, ensures its officers are fully trained on how to properly conduct a criminal investigation while complying with the Constitution and ensuring the civil rights of all parties involved.   The standards for these policies are set by the California Peace Officer Standards and Training ("P.O.S.T.").   It is required that all officers complete the requisite P.O.S.T. courses and become certified.  At all times in this investigation Chilson and Publicker were up to date in their requisite P.O.S.T. training.  The Police Department implements a general policy that all warrant affidavits are to be accurate, truthful, and contain all facts which will be material to the determination of whether a warrant should issue, both inculpatory and | 74.   Declaration of D. Snowden, ¶18, 5:20-6:9.<br><br>**Plaintiff's Response:**  Undisputed. |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| exculpatory. | |
| 75.   (*Misidentified by Plaintiff as No. 77*) Officers are also trained on proper methods of interacting with witnesses, such as letting them know they are free to go, where the restrooms are, as well as circumstances that would justify force, and a variety of other topics.  The Police Department enforces these policies several ways.  First officers are required to be up to date on their P.O.S.T. training.   The Police Department also provides courses and reference materials to its officers, and does so on a regular basis. | 75.   Declaration of D. Snowden, ¶19, 6:6-22.<br><br>**Plaintiff's Response:** Undisputed. |
| 76.   (*Misidentified by Plaintiff as No. 78*) Klein admits in his discovery responses that the P.O.S.T. training includes the requirement that exculpatory evidence be included in search warrant affidavits. | 76.   Response to City's Special Interrogatory No. 2, attached as Exhibit 29.<br><br>**Plaintiff's Response:** Undisputed. |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

| PLAINTIFF'S ADDITIONAL MATERIAL FACTS | DEFENDANTS' RESPONSE |
|---|---|
| 1.   The Rina Klein homicide investigation was the first, and only, | 1.   Undisputed as to the fact that this was Det. Chilson's first homicide |

| | |
|---|---|
| homicide investigation that Det. Chilson served as lead investigator for the Beverly Hills Police Department.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 41:8 to 49:12. | investigation where he served as lead investigator for the Beverly Hills Police Department. As to the claim that this was his only homicide investigation for the Beverly Hills Police Department, Defendants' respond as follows:<br><br>Objection: Misstates the evidence. Relevance. (FRE 402) This is not a material fact.<br><br>Detective Chilson testified that he was the lead investigator on two other death cases, after being assigned to the Klein case:<br><br>"Q.    After you were assigned to the Klein case, how many homicide investigations have you been involved in other than the Klein case while you were within the - - in the crimes versus person - - crimes against persons section?<br><br>A.    So I can answer it so it makes sense, you're using the term "homicide investigations."    Keep in mind there were other investigations, death investigations as they started, that I was the lead on that ultimately the cases were closed.    Including those, there's two others that come to mind. |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | Q.    And so I understand you, then, besides the Klein investigation, there have been two other death cases that you've been the lead investigator on? <br> A.    Correct." <br> Evidence: Partial transcript of Depo D. Chilson, 677:13-678:2, attached as Exhibit Defendants' Exhibit 57. |
| 2.    Det. Chilson reviewed the Coroner's report to determine Rina Klein's cause of death. <br> Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 44:20-24. | 2.    Objection: Misstates the cited testimony. Detective Chilson testified that he reviewed the Coroner's report to ascertain *what the Coroner determined* as to Rina Klein's cause of death. |
| 3.    Det. Chilson is withholding his handwritten case notes from his investigation of the Rina Klein homicide investigation. <br> Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 64:14 to 66:1, 122:6-15. | 3.    Objection: Relevance.    (FRE 402)    After Plaintiff's July 10, 2015 request, the four steno notepads with handwritten notes were promptly provided, after review and bates ranging.  Furthermore, in March 2015, approximately 266 supplemental reports documenting each step in the investigation, search warrants and supporting affidavits, audio recordings of the interviews of various witnesses, non-privileged records obtained through the search warrants, and expert consultant reports were produced to Plaintiff for inspection and copying. |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | Evidence: Declaration of A. Salusky in Support of Defendants' Reply, ¶¶ 3-5. |
|---|---|
| 4.      Det. Chilson is withholding his murder-book chronology of his investigation of the Rina Klein homicide investigation.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 66:6-67:5. | 4.      Objection: Relevance. (FRE 402) Argumentative as to the term "murder-book." After Plaintiff's July 10, 2015 request, the chronology was promptly provided, after review and bates ranging. Furthermore, in March 2015, approximately 266 supplemental reports documenting each step in the investigation, search warrants and supporting affidavits, audio recordings of the interviews of various witnesses, non-privileged records obtained through the search warrants, and expert consultant reports were produced to Plaintiff for inspection and copying. Evidence: Declaration of A. Salusky in Support of Defendants' Reply, ¶¶ 2, 4, 5. |
| 5.      Beverly Hills Police Chief Snowden referred the Rina Klein matter directly to the Detective Bureau after Chief Snowden was contacted by an Ex-FBI agent who happened to be friends with the Chief.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 72:25-73:5; | 5.      Objection: Relevance. (FRE 402) (See also, Defendants' objections to Plaintiff's evidence, objection no. 1) |

1102215.1

| | |
|---|---|
| 74:15-20; 79:25-80:22. | |
| 6.    The    Rina    Klein    homicide investigation was the only case that Det. Chilson is aware of that was referred directly to the detective's bureau by the Beverly Hills' Chief of Police.<br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 84:4-8. | 6.    Objection: Relevance. (FRE 402) Undisputed. |
| 7.    Det. Chilson was in possession of Rina Klein's complete medical file from her stay at Cedars-Sinai Medical Center between May 29, 2009 and the date of her death, May 31, 2009 prior to the time he created and signed his affidavit in support of the December 2011 Search Warrant.<br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 87:1-7. | 7.    Objection:    Misstates    the testimony. The correct testimony is as follows:<br>"Q.    ... When you created the affidavit for this search warrant in December of 2011, you already had Rina Klein's medical records from Cedars-Sinai for *May 29 to 30, 2009*, in the possession of the Beverly Hills Police Department?<br>A.    I    believe    I    did."    (Emphasis added) |
| 8.    Det. Chilson did not care that his informant, Julie Pakula, who he was relying on for information for his affidavit had an axe to grind with Gary Klein.<br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 88:17-89:5; 89:14 to 90:1-11. | 8.    Objection:    Misstates    the testimony. Argumentative regarding "did not care" and "axe to grind" and assumes    facts    not    in    evidence. Detective Chilson testified that in December 2011 he understood Julie Pakula to be distraught over the death of her daughter.  Detective Chilson further testified that he did not think Julie |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | Pakula cared for Mr. Klein. |
| | Evidence:     Plaintiff's     Deposition Excerpts of D. Chilson, 88:17-89:5; 89:14 to 90:1-11. |
| 9.     Det. Chilson did not consider the motivations of his informant, Julie Pakula, to be relevant to his investigation. Evidence:     *See* Plaintiff's Deposition Excerpts of D. Chilson, 91:3-92:4. | 9.     Objection:   Misstates the cited testimony.   This is an improper conclusion, not a fact.   Plaintiff's evidence does not support this fact. Instead, the cited testimony relates to hypothetical questions posed to Detective Chilson. |
| 10.     In July 2009, the month that the Rina Klein homicide investigation began, Det. Chilson knew that an autopsy had been performed on Rina Klein. Evidence:     *See* Plaintiff's Deposition Excerpts of D. Chilson, 93:15- 94:22. | 10.     Objection:   Misstates the cited testimony.   Plaintiff's evidence does not support this fact.   Argumentative regarding the term "autopsy".   The question posed to Detective Chilson related to a "Class D" autopsy. On June 4, 2009, a Class D Examination was performed by Dr. James Ribe at the Los Angeles County Coroner's Office on Rina Klein's remains before her burial. According to Dr. Ribe, a Class D Examination is not an autopsy.   Rather it is an external examination only with obtaining toxicology samples.   The Class A Autopsy was later performed by Dr. Ribe in August 2009. Evidence: Depo J. Ribe taken on July |

1102215.1

| | |
|---|---|
| | 17, 2015, 660:12-661:25, 665:12-666:4, 668:2-7, attached as Defendants' Exhibit 56; Defendants' Exhibit 9, Medical Report re Class D Exam at p. 75; Plaintiff's Exhibit 38, Medical Report re Class D Exam at p. 2. |
| 11.   Detective Chilson knew that Anita Pakula had Rina Klein's medical directive and could order the autopsy of Rina Klein's person notwithstanding Klein's religious beliefs that militated against doing an autopsy.<br><br>Evidence:  *See* Defendant's Ex. 8, Page 53, Para. 7. | 11.   Objection:   Relevance.  (FRE 402)  Lack of foundation. (FRE 104) Misstates the evidence.  The cited testimony does not support this fact. The cited evidence states, "Investigator Blacklock stated that when he received the case, he requested that blood be taken from the decedent for testing purposes.  However, that had not been done and only bile had been sampled for testing.  Additionally, at the request of Gary Klein, no autopsy had been performed." |
| 12.   Det.  Chilson's July 2011 and December 2011 Affidavit stated that Gary Klein insisted that no autopsy be performed on Rina Klein's body which was false.<br><br>Evidence:   *See* Plaintiff's Exh. 42, Transcript of Daniel Chilson's (DC) interview with Rabbi Steven Weil (SW), Dated August 13, 2009, 1:10-15; *See* | 12.   Objection: Lack of foundation. (FRE 104) Plaintiff's evidence does not support this fact. On August 4, 2009, Gary Klein informed Detective Chilson during a voluntary interview that he objected to an autopsy being performed and communicated with an investigator from the Coroner's Office to request that it be as minimal as possible, if it |

WOODRUFF, SPRADLIN<br>& SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

| | | |
|---|---|---|
| 1 | Plaintiff's Deposition Excerpts of D. Chilson 95:7-21. | was done at all.  Gary Klein also told Detective Chilson that he asked Rina's mom, Julie Pakula, to talk to Anita about avoiding an autopsy: |

Plaintiff's Deposition Excerpts of D. Chilson 95:7-21.

was done at all.  Gary Klein also told Detective Chilson that he asked Rina's mom, Julie Pakula, to talk to Anita about avoiding an autopsy:

"GK: The directive said it was up to, up to Anita.

DC:   So what did Anita want to do?

GK:   She wanted to have the autopsy.

DC:   She wanted to have one, you…

GK:   So I said, oh you know I did say to Julie, I said Julie talk to Anita, don't let her do that.  She doesn't need to do it."

Helene Klein (sister of Gary Klein) testified that in the hospital, Gary said he did not want Rina's body cut up. (See also, Defendants' objections to Plaintiff's evidence, objection no. 4)

Evidence:   Interview transcript of G. Klein on August 4, 2009, Part 2 of 2, 680:28-682:12, 683:13-18, attached as Defendants' Exhibit 58; Audio of interview of G. Klein at 4:55 through 9:11 and 10:52 through 11:07, attached as Exhibit 1;   Depo H. Klein at 413:1:414:4, attached as Exhibit 21.

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

| | |
|---|---|
| 13.     On July 4, 2009, Det. Chilson knew that informant Anita Pakula never told him that the continual renal therapy of Rina Klein's kidneys was an effort by Gary Klein to have Rina Klein's blood cleansed of any evidence of intoxicants. Evidence:  *See* Klein Exh. 39, Email from Anita Pakula to Det. Chilson, July 4, 2009. | 13.     Objection:     Misstates     the evidence.  Plaintiff's evidence does not support this fact. Lack of foundation. (FRE 104)     The email from Anita Pakula to Detective Chilson states in pertinent part, "Gary insisted on the Doctors doing dialysis on Rina to wash the poisons out of her to see if it could reverse some of the damage and since she was having kidney failure I had agreed with the [sic] her Doctors to go ahead but in retrospect only the blood taken before the dialysis would be useful. Evidence: Plaintiff Exhibit 39, Email from A. Pakula to D. Chilson, July 4, 2009. |
| 14.     Chilson     failed     to     review     Rina Klein's Cedar-Sinai Medical Records and interview Rina Klein's treating physicians to verify if Gary Klein 'insisted' that Rina Klein receive kidney dialysis. Evidence:     *See*  Plaintiff's Deposition Excerpts of D. Chilson, 128:15 to 130:8. | 14.     Objection:     Misstates     cited testimony.  Plaintiff's evidence does not support this fact. Also, this contradicts' Plaintiff's     Additional     Fact     No.     15. Detective     Chilson     interviewed     Rina Klein's treating physician Chad Miller, M.D. in October 2010. Evidence:     Beverly     Hills     Police Department Supplemental Report No. 0121, Interview of Chad Miller, M.D., attached as Plaintiff's Exhibit 49, at p. |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

| | |
|---|---|
| | 148. |
| 15.    Chilson knew that it was Rina Klein's treating physicians that insisted on kidney dialysis, not Klein because Det. Chilson had finally interviewed one of Rina Klein's treating physician at Cedars-Sinai Medical Center, Dr. Chad Miller, M.D.<br><br>Evidence:  *See* Klein Exh. 49, Page 148. | 15.    Objection:    Relevance.    (FRE 402) Vague as to time. Misstates the cited evidence. Plaintiff's evidence does not support this fact. (See also, Defendants' objections to Plaintiff's evidence, objection no. 8) |
| 16.    Det. Chilson's December 21, 2011 Affidavit stated that Gary Klein insisted that Rina Klein receive dialysis while she was being treated at Cedars-Sinai was false because Det. Chilson knew that Rina Klein's sister, Anita Pakula, was the only person able to make medical decisions on behalf of Rina Klein and her body.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 97:20-98:23. | 16.    Objection:    Relevance    (FRE 402).    Misstates the cited testimony. Plaintiff's evidence does not support this fact. Detective Chilson testified that according to witnesses, Gary Klein was insistent that dialysis be performed on the body of Rina Klein. Furthermore, the December 2011 Search Warrant Affidavit states that Dr. Feldman reported that Plaintiff was insistent that Rina Klein receive dialysis at the hospital.<br><br>Evidence:    Plaintiff's    deposition excerpts of D. Chilson, 98:22-23; December 2011 Search Warrant Affidavit at p. 127, lines 5-8, attached as Exhibit 12. |
| 17.    Det. Chilson's December 21, 2011 Affidavit stating that Gary Klein insisted | 17.    Objection:    Relevance.    (FRE 402)    Misstates the cited testimony. |

WOODRUFF, SPRADLIN & SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

1102215.1

that no autopsy be performed on Rina Klein's body was false because Det. Chilson knew that Rina Klein's sister, Anita Pakula, was the only person able to make a decision as to whether an autopsy would be performed on Rina Klein.

Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 99:3-25.

Plaintiff's evidence does not support this fact. The December 2011 search warrant affidavit states that Dr. Feldman reported that Gary Klein insisted that no autopsy be performed. Furthermore, on August 4, 2009, Gary Klein informed Detective Chilson during a voluntary interview that he objected to an autopsy being performed and communicated with an investigator from the Coroner's Office to request that it be as minimal as possible, if it was done at all. Gary Klein also told Detective Chilson that he asked Rina's mother, Julie Pakula, to talk to Anita about avoiding an autopsy. Helene Klein (sister of Gary Klein) testified that in the hospital, Gary did not want Rina's body cut up.

Evidence: December 2011 Search Warrant Affidavit at p. 127, lines 5-9, attached as Exhibit 12; Interview transcript of G. Klein on August 4, 2009, Part 2 of 2, 680:28-682:12, 683:13-18, attached as Defendants' Exhibit 58; Audio of interview of G. Klein at 4:55 through 9:11 and 10:52 through 11:07, attached as Exhibit 1;

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| | Depo H. Klein at 413:1:414:4, attached as Exhibit 21. |
| 18.    Det. Chilson did not disclose to the Magistrate the material fact that on August 13, 2009, Chilson knew that it was Klein's Rabbi, Rabbi Steven Weil that asked for a limited autopsy or no autopsy at all of Rina Klein's body, not Klein.<br><br>Evidence:  *See* Defendants' Transcript of the Interview of Rabbi Steven Weil, Dated August 13, 2009, Page One, Lines 10-15. | 18.    Objection:    Relevance.   (FRE 402) Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. On August 4, 2009, Gary Klein informed Detective Chilson during a voluntary interview that he objected to an autopsy being performed and communicated with an investigator from the Coroner's Office to request that it be as minimal as possible, if it was done at all.   Gary Klein also told Detective Chilson that he asked Rina's mother, Julie Pakula, to talk to Anita about avoiding an autopsy. Helene Klein (sister of Gary Klein) testified that in the hospital, Gary did not want her body cut up. (See also, Defendants' objections to Plaintiff's evidence, objection no. 4)<br><br>Evidence:   Interview transcript of G. Klein on August 4, 2009, Part 2 of 2, 680:28-682:12, 683:13-18, attached as Defendants' Exhibit 58; Audio of interview of G. Klein at 4:55 through 9:11 and 10:52 through 11:07, attached as Exhibit 1; Depo H. Klein at |

1102215.1

| | |
|---|---|
| | 413:1:414:4, attached as Exhibit 21. |
| 19.    In the five years the investigation was active, Det. Chilson never interviewed Dr. Allan Metzger to corroborate any of the information he had been given by Dr. Edward Feldman or Anita Pakula in violation of his POST training since there were no exigent circumstances surrounding the Rina Klein homicide investigation.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 100:1-101:20; 102:5-16.  *See* Plaintiff's Deposition Excerpts of M. Publicker, 33:1-34. | 19.    Objection:    Relevance.  (FRE 402) Argumentative as to the term "in violation of his POST training".  This is an improper conclusion, not an evidentiary fact.  Plaintiff has not submitted any admissible evidence regarding POST training.  Also, the testimony cited does not support this purported fact. Without waiving these objections, it is Undisputed that Detective Chilson never interviewed Dr. Allan Metzger; however, this is immaterial because Plaintiff does not dispute the information in the June 2011 Search Warrant Affidavit, which stated that Dr. Metzger's medical license revealed that he received a public reprimand for engaging in fraudulent medical practice related to writing prescriptions for a celebrity (Michael Jackson) under a false name.  It also is immaterial because Plaintiff does not dispute the information in the December 2011 Search Warrant Affidavit that Dr. Metzger received a public reprimand, that he had a reputation as "Dr. Feel Good" of the Westside of Los Angeles |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | and has prescribed painkillers to a friend of Dr. Feldman's wife, which she used to commit suicide. |
|---|---|
| | Evidence:   June 2011 Search Warrant Affidavit at p. 93, lines 1-9 attached as Exhibit 11; December 2011 Search Warrant Affidavit at p. 127, lines 9-14, Defendants' Exhibit 12. |
| 20.   At the time Det. Chilson executed his December 2011 affidavit, he did not know whether Dr. Metzger had anything to do with Rina Klein's death because he never interviewed Dr. Metzger to corroborate any of the information he had been given by informants Dr. Edward Feldman, Julie Pakula or Anita Pakula.<br><br>Evidence:  Plaintiff's Deposition Excerpts of D. Chilson, 100:1-101:20; 102:5-16; 125:6-24.  *See*  Plaintiff's  Deposition Excerpts of M. Publicker, 33:1-34. | 20.   Objection:   Relevance.   (FRE 402)   Improper conclusion.   Not an evidentiary fact.  The testimony cited does not support this purported fact. Undisputed that Detective Chilson never interviewed Dr. Allan Metzger. |
| 21.   Det. Chilson's statement in his December 2011 Affidavit that his "investigation into the death of Rina Pakula Klein…is believed to be a homicide" was in direct conflict with the initial autopsy report indicated she had died of natural causes.<br><br>Evidence:   *See*  Plaintiff's  Deposition | 21.   Objection:   Relevance.   (FRE 402)   Improper argument.   Not an evidentiary fact.   The testimony cited does not support this purported fact. Undisputed that in June 2009, a Class D Examination was performed, which is an external examination of the body and taking of fluids for toxicology testing. |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| Excerpts of D. Chilson, 108:5-109:25. | A Class D Examination is not an Autopsy.  Based upon this examination, the Coroner concluded that Rina Klein died from natural causes.  Subsequently, on August 4, 2009, Rina Klein's remains were exhumed and the Coroner's Office conducted a Class A Autopsy.  Autopsies are classified as "A, B, and C," with A being the most comprehensive of the three.  The conclusion from the Class A Autopsy changed the cause of death from Natural to Undetermined.  The Chief Medical Examiner reviewed and approved the finding of Undetermined.  The Coroner concluded that there is no way to rule out that Rina Klein died from a toxic cause.  Detective Chilson was aware of the findings from the Class A Autopsy when he drafted the December 2011 Affidavit.  Detective Chilson stated in the affidavit that on August 4, 2009, Rina's body was exhumed "and a full autopsy (Class A) was performed at the Los Angeles Coroner's Office.  Following the autopsy, the cause of death was changed from Natural to Undetermined." |

45

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| | Evidence: Deposition Transcript of J. Ribe, 660:12-661:25; 665:7-666:4, 667:15-23, 668:2-7; 669:25-670:14; 671:22-672:7; 674:23-675:10, attached as Exhibit 56; December 2011 Search Warrant Affidavit at p. 127, lines 29-31, attached as Exhibit 12. |
| 22. In the December 2011 Affidavit, Det. Chilson stated that there were suspicions about Rina Klein's death including "the fact that her husband was insistent she received dialysis at the hospital while she was being treated" even though he knew that Klein did not insist on dialysis be performed because Det. Chilson had interviewed Cedar-Sinai's nephrologist, Dr. Ukoha who informed him that Gary Klein did not insist on dialysis because it was part of her normal treatment plan since she suffered from kidney failure.<br><br>Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 274:21-276:13. | 22. Objection: Relevance. (FRE 402) Improper argument. Not an evidentiary fact. The testimony cited does not support this purported fact. Vague as to time. Without waiving these objections, it is Undisputed that Detective Chilson interviewed Dr. Ukoha, who informed him that he could not recall Gary Klein being insistent that Rina receive dialysis. The email from Anita Pakula to Detective Chilson states in pertinent part, "Gary insisted on the Doctors doing dialysis on Rina to wash the poisons out of her to see if it could reverse some of the damage and since she was having kidney failure I had agreed with the [sic] her Doctors to go ahead but in retrospect only the blood taken before the dialysis would be useful.<br><br>Evidence: Email from Anita Pakula to |

1102215.1

| | Det. Chilson dated July 4, 2009, attached as Plaintiff's Exhibit 39. |
|---|---|
| 23. Det. Chilson declared in his affidavit in support of the July 21, 2011 search warrant that Gary Klein insisted on dialysis for Rina Klein even though he knew that the treating physicians had recommended it.<br><br>Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 8:15-130:8; 158:4-11. | 23. Objection: Relevance. (FRE 402) Improper argument. Not an evidentiary fact. The testimony cited does not support this purported fact. Vague as to time. Undisputed that Detective Chilson interviewed Dr. Ukoha, who informed him that he could not recall Gary Klein being insistent that Rina receive dialysis. Undisputed that the June 2011 Search Warrant Affidavit states that Anita Pakula reported that Gary Klein insisted on dialysis. The email from Anita Pakula to Detective Chilson states in pertinent part, "Gary insisted on the Doctors doing dialysis on Rina to wash the poisons out of her to see if it could reverse some of the damage and since she was having kidney failure I had agreed with the [sic] her Doctors to go ahead but in retrospect only the blood taken before the dialysis would be useful.<br><br>Evidence: June 2011 Search Warrant Affidavit at p. 95, lines 21-23, attached as Exhibit 11; Email from Anita Pakula |

WOODRUFF, SPRADLIN & SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

| | |
|---|---|
| | to Det. Chilson dated July 4, 2009, attached as Plaintiff's Exhibit 39. |
| 24.    Det. Chilson admitted to making a 'deliberate falsehood' in his July 2011 Affidavit when he declared: "Additionally, no autopsy was performed on Rina Klein's body."<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 130:5-24. | 24.    Objection:    Relevance.    (FRE 402)    Improper argument.    Not an evidentiary fact.    Plaintiff's cited evidence, deposition of D. Chilson, 130:7-20, in actuality states the exact opposite of this purported fact: "Q: And wasn't your statement in lines 13 to 14 that "no autopsy was performed on Rina Klein's body" also a deliberate falsehood? A: No."<br><br>Without waiving these objections, it is Undisputed that in June 2009, a Class D Examination was performed, which is an external examination of the body and taking of fluids for toxicology testing. A Class D Examination is not an Autopsy.   Based upon this exam, the Coroner concluded that Rina Klein died from natural causes.   Subsequently on August 4, 2009, Rina Klein's remains were exhumed and the Coroner's Office conducted a Class A Autopsy. Autopsies are classified as "A, B, and C" with A being the most comprehensive of the three.    The conclusion from the Class A Autopsy |

48

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| | changed the cause of death from Natural to Undetermined. The Chief Medical Examiner reviewed and approved the finding of Undetermined. The Coroner concluded that there is no way to rule out that Rina Klein died from a toxic cause. Detective Chilson was aware of the findings from the Class A Autopsy when he drafted the December 2011 Affidavit. He stated in the affidavit that on August 4, 2009, Rina's body was exhumed "and a full autopsy (Class A) was performed at the Los Angeles Coroner's Office. Following the autopsy, the cause of death was changed from Natural to Undetermined."<br><br>Evidence: Deposition Transcript of J. Ribe, 660:12-661:25; 665:7-666:4, 667:15-23, 668:2-7; 669:25-670:14; 671:22-672:7; 674:23-675:10, attached as Exhibit 56; December 2011 Search Warrant Affidavit at p. 127, lines 29-31, attached as Exhibit 12. |
| 25. Det. Chilson knew Rina Klein's death was ruled an accident at the time he made his July 2011 Affidavit but omitted this information in his Affidavit for the | 25. Objection: Relevance. (FRE 402) Improper argument. Misstates evidence. The testimony cited does not support this purported fact. Without |

49

| | |
|---|---|
| magistrate's analysis of probable cause. Evidence:   *See* Plaintiff's Deposition Excerpts of D. Chilson, 135:3-136:5. | waiving these objections, it is Undisputed that in June 2009, a Class D Examination was performed, which is an external examination of the body and taking of fluids for toxicology testing. A Class D Examination is not an Autopsy.   Based upon this exam, the Coroner concluded that Rina Klein died from natural causes.   Subsequently on August 4, 2009, Rina Klein's remains were exhumed and the Coroner's Office conducted a Class A Autopsy. Autopsies are classified as "A, B, and C" with A being the most comprehensive of the three.   The conclusion from the Class A Autopsy changed the cause of death from Natural to Undetermined.   The Chief Medical Examiner reviewed and approved the finding of Undetermined. The Coroner concluded that there is no way to rule out that Rina Klein died from a toxic cause.   Detective Chilson was aware of the findings from the Class A Autopsy when he drafted the June 2011 Affidavit.   Detective Chilson documented in the June 2011 search warrant affidavit that "It should be |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

50

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| | noted DME Ribe performed the minimally invasive class "D" examination on 06/03/09 following Rina Klein's death." Detective Chilson explained in the June 2011 search warrant affidavit that a Class A Autopsy was subsequently performed and the conclusion regarding Rina's cause of death changed to "cause not established."<br><br>Evidence: Deposition Transcript of J. Ribe, 660:12-661:25; 665:7-666:4, 667:15-23, 668:2-7; 669:25-670:14; 671:22-672:7; 674:23-675:10, attached as Exhibit 56; June 2011 Search Warrant Affidavit at p. 98, lines 22-24, p. 99, lines 21-32 through p. 100, lines 1-2, p. 101, lines 25-30, attached as Exhibit 11. |
| 26.    Det. Chilson knew that no one in Rina Klein's family had objected to the coroner performing a Class D Autopsy on the body of Rina Klein yet Det. Chilson omitted this information in his July 2011 Affidavit to the magistrate.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 136:6-137:14. | 26.    Objection:    Relevance.    (FRE 402) Lacks Foundation.    (FRE 104). Improper    argument.    Misstates    the evidence. On August 4, 2009, Gary Klein    informed    Detective    Chilson during a voluntary interview that he objected to an autopsy being performed and communicated with an investigator from the Coroner's Office to request |

51

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| | that it be as minimal as possible, if it was done at all. Gary Klein also told Detective Chilson that he asked Rina's mom, Julie Pakula, to talk to Anita about avoiding an autopsy. Helene Klein (sister of Gary Klein) testified that in the hospital, Gary did not want her body cut up.<br><br>Evidence: Interview transcript of G. Klein on August 4, 2009, Part 2 of 2, 680:28-682:12, 683:13-18, attached as Exhibit 58; Audio of interview of G. Klein at 4:55 through 9:11 and 10:52 through 11:07, attached as Exhibit 1; Depo H. Klein at 413:1:414:4, attached as Exhibit 21. |
| 27. Det. Chilson knew that Rina Klein had died of natural causes but omitted this information in his July 2011 Affidavit to the magistrate.<br><br>Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 139:5-9. | 27. Objection: Relevance (FRE 402). Improper argument. Misstates evidence. The testimony cited does not support this purported fact. Undisputed that in June 2009, a Class D Examination was performed, which is an external examination of the body and taking of fluids for toxicology testing. A Class D Examination is not an Autopsy. Based upon this exam, the Coroner concluded that Rina Klein died from natural causes. Subsequently on |

August 4, 2009, Rina Klein's remains were exhumed and the Coroner's Office conducted a Class A Autopsy. Autopsies are classified as "A, B, and C" with A being the most comprehensive of the three. The conclusion from the Class A Autopsy changed the cause of death from Natural to Undetermined. The Chief Medical Examiner reviewed and approved the changed finding. Coroner Ribe concluded that there is no way to rule out that Rina Klein died from a toxic cause. Detective Chilson was aware of the findings from the Class A Autopsy when he drafted the June 2011 Affidavit. Detective Chilson documented in the June 2011 Search Warrant Affidavit that "It should be noted DME Ribe performed the minimally invasive class "D" examination on 06/03/09 following Rina Klein's death." Detective Chilson explained in the June 2011 Search Warrant Affidavit that a Class A Autopsy was subsequently performed and the conclusion regarding Rina's cause of death changed to "cause not

1102215.1

| | |
|---|---|
| | established." Evidence: Deposition Transcript of J. Ribe, 660:12-661:25; 665:7-666:4, 667:15-23, 668:2-7; 669:25-670:14; 671:22-672:7; 674:23-675:10, attached as Exhibit 56; June 2011 Search Warrant Affidavit at p. 98, lines 22-24, p.99, lines 21-32 through p. 100, lines 1-2, p. 101, lines 25-30, attached as Exhibit 11. |
| 28. Det. Chilson knew that Rina Klein's toxicology report from her Class D Autopsy was negative for any drugs, including 'Percocet', but omitted this information in his July 2011 Affidavit that he presented to the magistrate. Evidence: *See* the Los Angeles County Coroner Case Notes, Klein Exh. 55, Page 215 (7/1/2009 – "Bile specimen run for oxycodone (Percocet) – no drug present.") | 28. Objection: Relevance. (FRE 402) Lacks foundation. (FRE 104) Impermissible hearsay (FRE 802). Improper opinion and conclusions. (FRE 701) Misstates evidence. The testimony cited does not support this purported fact. The toxicology testing performed in connection with the Class D Examination only tested for commonly abused prescription drugs. The toxicology report revealed findings that were negative for "Percocet". The June 2011 Search Warrant Affidavit states that "Blacklock later said that toxicology test results for the bile indicated no evidence of drugs." (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

54

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

|  |  |
|---|---|
|  | Evidence:   Deposition Testimony of J. Ribe, M.D. at 662:8-664:15, attached as Exhibit 56; June 2011 Search Warrant Affidavit at p. 98, lines 11-12, attached as Exhibit 11. |
| 29.    Det. Chilson believes he is under no obligation to include exculpatory facts in any of his Affidavits filed in support of the search warrants in issue in this case which violates his POST training. <br> Evidence:   *See* Plaintiff's Deposition Excerpts of D. Chilson, 145:16-25; 146:22-149:7. | 29.    Objection:   Misstates the evidence. Improper opinion and conclusions. (FRE 701) Improper argument. No evidence has been presented regarding POST training. Further, Detective Chilson testified that it is not reasonable to include every piece of evidence stated in a supplemental report. |
| 30.    Det. Chilson did not interview Klein's accountant Mr. Fred Maidenberg to confirm that Gary and Rina Klein used the same accountant as Julie Pakula. <br> Evidence:   *See* Plaintiff's Deposition Excerpts of D. Chilson, 149:16-151:8; 151:24-152:5; and 152:14-24. | 30.    Objection:   Relevance. (FRE 402) Also, assumes facts not in evidence. Without waiving these objections, Undisputed that Det. Chilson did not interview Mr. Maidenberg. |
| 31.    There was no objection to the first autopsy on Rina Klein's body but that was not disclosed to the magistrate when Det. Chilson applied for the August 2009 and July 2011 Search Warrants. <br> Evidence:   *See* Deposition Excerpts of D. Chilson, 161:13-162:25. | 31.    Objection:   Relevance. (FRE 402) Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. Also, assumes facts not in evidence and misstates the evidence that the first purported autopsy was a Class D |

examination. Defendants' do not dispute that in June 2009, a Class D Examination was performed, which is an external examination of the body and taking of fluids for toxicology testing. A Class D Examination is not an Autopsy. On August 4, 2009, Gary Klein informed Detective Chilson during a voluntary interview that he objected to an autopsy being performed and communicated with an investigator from the Coroner's Office to request that it be as minimal as possible, if it was done at all. Gary Klein also told Detective Chilson that he asked Rina's mother, Julie Pakula, to talk to Anita about avoiding an autopsy. Helene Klein (sister of Gary Klein) testified that in the hospital, Gary did not want Rina's body cut up.

Evidence: Deposition Transcript of J. Ribe, 660:12-661:25; 665:7-666:4, 667:15-23, 668:2-7; 669:25-670:14; 671:22-672:7; 674:23-675:10, attached as Exhibit 56; Interview transcript of G. Klein on August 4, 2009, Part 2 of 2, 680:28-682:12, 683:13-18, attached as Exhibit 58; Audio of interview of G.

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

| | |
|---|---|
| | Klein at 4:55 through 9:11 and 10:52 through 11:07, attached as Exhibit 1; Depo H. Klein at 413:1:414:4, attached as Exhibit 21. |
| 32.    Det. Chilson misstated the evidence to Coroner Investigator Blacklock concerning who 'insisted' on Rina Klein's dialysis and used Investigator Blacklock's "red flag" conclusion that resulted of Det. Chilson's misstatement in his August 2009 and July 2011 Affidavits which mislead the magistrate into issuing the search warrants.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 167:7-168:8; 168:25-169:23. | 32.    Objection:    Relevance.    (FRE 402)    Improper    argument    and conclusion/opinion. This is not a proper statement of fact.    The cited evidence does not support the purported fact. Detective    Chilson    testified    that according to witnesses, Gary Klein was insistent that dialysis be performed on the body of Rina Klein. The email from Anita Pakula to Detective Chilson states in pertinent part, "Gary insisted on the Doctors doing dialysis on Rina to wash the poisons out of her to see if it could reverse some of the damage and since she was having kidney failure I had agreed with the [sic] her Doctors to go ahead but in retrospect only the blood taken before the dialysis would be useful.    Furthermore, the June 2011 Search Warrant Affidavit states that Anita Pakula reported that Gary Klein, who is not a doctor, insisted that Rina be put on dialysis.<br><br>Evidence:    Plaintiff's    deposition |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | excerpts of D. Chilson, 98:22-23; Plaintiff Exhibit 39, Email from A. Pakula to D. Chilson, July 4, 2009; June 2011 Search Warrant Affidavit at p. 95, lines 21-24 attached as Exhibit 11. |
|---|---|
| 33.   On June 2, 2009, Detective Chilson knew the Los Angeles Coroner performed a Class "D" Limited Autopsy on Rina Klein but did not disclose this fact to the magistrate in his August 2009 Affidavit. Evidence:  *See* Deposition Excerpts of D. Chilson, 169:24-170:11. | 33.   Objection:   Relevance.   (FRE 402)  Any claims arising out of the August 2009 search warrant are barred by the statute of limitations.  Misstates the evidence.  The cited testimony does not support the purported fact. Argumentative regarding the term "Class D Limited Autopsy".  On June 2, 2009, Detective Chilson knew that the Los Angeles Coroner performed a Class "D" Examination on Rina Klein, which is an external examination of the body and drawing fluids for toxicology testing.  He disclosed the fact that test results indicated no evidence of drugs and attached a copy of the Coroner's Investigative Narrative to the August 2009 Affidavit. Evidence:  Exhibit 18, p. 53, ¶7, p. 19, ¶1, p. 59-60; Depo J. Ribe taken on July 17, 2015, 660:12-661:25, 665:12-666:4, 668:2-7, attached as Exhibit 56. |

1102215.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| 34.    Det. Chilson failed to disclose any of the information he learned from his interview with the Paramedics who transported Rina Klein to Cedars on May 29, 2009.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 170:20-171:2. | 34.    Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. Plaintiff fails to state what information would have been material. Furthermore, in the July 2011 and December 2011 Search Warrant Affidavits, Detective Chilson did include this information for the magistrate's review.<br><br>Evidence: June 2011 Search Warrant Affidavit, p. 102, lines 7-14, attached as Ex. 11; December 2011 Search Warrant Affidavit, p. 126, lines 20-22, attached as Exhibit 12. |
| 35.    Det. Chilson knew before he made his July 2011 affidavit that Rina Klein was taking high doses of Wellbutrin which could have led to her death but did not disclose this fact to the magistrate.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of D. Chilson, 172:4-173:12. | 35.    Objection: Relevance. (FRE 402) Plaintiff fails to state what information would have been material. Furthermore, in the July 2011 Search warrant affidavit, Detective Chilson did include information for the magistrate's review that Rina was taking Wellbutrin and the timing of when the treating doctors in the emergency room first found out.<br><br>Evidence: June 2011 Search Warrant Affidavit, p. 102, lines 7-14, 16-20, attached as Exhibit 11. |

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| 36. Det. Chilson omitted from his August 2009 Affidavit that Rina Klein's bile tested negative for drugs (Percocet). Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 208:3-9. *See* the Los Angeles County Coroner Case Notes, Klein Exh. 55, Page 215 (7/1/2009 – "Bile specimen run for oxycodone *(Percocet) – no drug present.*") emphasis added. | 36. Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. Furthermore, in the August 2009 Search warrant affidavit, Detective Chilson did include information that he was advised by Investigator Blacklock that Toxicology test result for the bile indicated no evidence of drugs. (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) Evidence: August 2009 Search Warrant Affidavit, p 53, ¶7, p. 54, ¶1, attached as Exhibit 8. |
| 37. At the time Det. Chilson made his August 2009 Affidavit, he knew that his informant hated Gary Klein and failed to disclose this fact and circumstance to the Magistrate. Evidence: *See* Plaintiff's Deposition Excerpts of D. Chilson, 218:8-14. | 37. Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. Misstates the evidence. The cited testimony does not support the purported fact. Detective Chilson stated that "it wasn't a good relationship between Julie and Gary, she communicated that to me." There is no evidence that any informant "hated" Gary Klein. |
| 38. Detective Chilson knew that Dr. Feldman did not see any Percodan or | 38. Objection: Relevance. (FRE 402) Any claims arising out of the |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| Percocet at the hospital amongst Rina Klein's property.<br><br>Evidence:   *See* Plaintiff's Deposition Excerpts of D. Chilson, 222:14-224:6. See Plaintiff's Exh. 40, Page 19 ("I (Dect. Chilson) asked Dr. Feldman if he saw any Percodan or Percocet at the hospital amongst Rina Klein's property.  He (Dr. Feldman) said that he did <u>not</u>… ." | August 2009 Search Warrant are barred by the statute of limitations. Immaterial. (See also, Defendants' objections to Plaintiff's evidence, objection no. 10) |
| 39.   Det.  Chilson  did  not  consider reviewing Rina Klein's medical records from her treatment at Cedars-Sinai between May 29, 2009 and May 31, 2009 prior to making his affidavit in support of the August 2009 search warrant.<br><br>Evidence:   *See* Plaintiff's Deposition Excerpts of D. Chilson, 224:9-225:13. | 39.   Objection:   Relevance.   (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by the statute of limitations. Argumentative and improper conclusion.   Misstates   the   cited testimony. Detective Chilson testified that he did not recall whether he reviewed the medical records from Cedar-Sinai at the time he prepared the August 2009 Search Warrant Affidavit. |
| 40.   Det.  Chilson  knew  that  Anita Pakula agreed with the decision to perform renal therapy (a form of kidney dialysis) on Rina Klein at the hospital but did not include this material fact in his August 2009 affidavit for the Magistrate to weigh in the determination of probable cause. | 40.   Objection: Relevance (FRE 402). Any claims arising out of the August 2009 search warrant are barred by the statute of limitations. Improper conclusion.   Misstates  the  evidence. The  August  2009  Search  Warrant Affidavit includes the information that Anita agreed to the dialysis, as she was |

1102215.1

| | |
|---|---|
| Evidence:  *See* Deposition Excerpts of D. Chilson, 225:15-22.  *See* Klein's Exh. 39, Email from Anita Pakula. | feeling tired and worn down from lack of sleep.<br><br>Evidence: August 2009 Search Warrant Affidavit at p. 50, ¶5, attached as Exhibit 8. |
| 41.    At the time Det. Chilson prepared and signed his affidavit in support of the August 2009 search warrant, he knew that Anita Pakula had control of Rina Klein's medical treatment and disposition of her remains due to Rina Klein's health care directive but did not disclose these facts to the Magistrate.<br><br>Evidence:  *See* Deposition Excerpts of D. Chilson, Page 35, 226:3-228:4; 230:10-231:15. | 41.    Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by the statute of limitations.    Improper conclusion.    Misstates the evidence. The August 2009 Search Warrant Affidavit states, "Anita first indicated she was the Agent as listed on Rina's Advance Health Care Directive. This gave her power of attorney over health decisions for Rina."<br><br>Evidence: August 2009 Search Warrant Affidavit at p. 50, ¶2, attached as Exhibit 8. |
| 42.    At the time Det. Chilson prepared and signed his affidavit in support of the August 2009 search warrant, Det. Chilson knew why Gary Klein wanted renal therapy done on Rina Klein but he failed to include this material fact in his affidavit for the Magistrate.<br><br>Evidence:  *See* Deposition Excerpts of D. Chilson, 249:2-17. | 42.    Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by the statute of limitations. |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| 43. The evidence that Det. Chilson uncovered during his July 3, 2009 telephone interview with Dr. Edward Feldman as set forth in Supplement Report #1 were omitted in Det. Chilson's August 2009 Affidavit.<br><br>Evidence: *See* Plaintiff Exh. 40; Deposition Excerpts of D. Chilson, 252:8-253:5,<br><br>(D. Chilson authenticated Supplemental Report #1, Plaintiff Exh. 40) | 43. Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by the statute of limitations. Vague and ambiguous as to what evidence Plaintiff is referring to. (See also, Defendants' objections to Plaintiff's evidence, objection no. 10) |
| 44. Cedars Emergency Room Physician did not tell Dr. Feldman that Rina Klein had amphetamines in her system yet Det. Chilson mentions 'amphetamines'.<br><br>Evidence: *See* Plaintiff Exh. 40 – Supplemental Report No. 0001.; Klein Exh. 41, Page, Para. 5. | 44. Objection: Relevance. (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by the statute of limitations. Also, misstates the evidence. In fact, the Class D Examination – Investigator's narrative states, "A urine test showed positive for amphetamines; however, also indicated the result might be a false positive due to the decedent's prescription of Provigil." Detective Chilson attached this evidence as Exhibit B to the August 2009 Search Warrant Affidavit, for the magistrate's review. (See also, Defendants' objections to Plaintiff's evidence, objection no. 10) |

1102215.1

| | |
|---|---|
| | Evidence: Search Warrant Affidavit at p. 59, ¶ 4 attached as Exhibit 8; Class D Examination at p. 76, ¶ 4, attached as Exhibit 9. |
| 45.   Dr.   Feldman   implied   to   Det. Chilson   that   there   was   a   possible explanation for the amphetamines (which turned out to be a false-positive) which Det.   Chilson   never   disclosed   to   the Magistrate in his August 2009 affidavit in support of his search warrant for Klein's residence. Evidence:   *See* Plaintiff Klein Exh. 40, Pp. 13-14 Supplemental Report No. 0001 | 45.   Objection:   Relevance.   (FRE 402) Any claims arising out of the August 2009 Search Warrant are barred by   the   statute   of   limitations.   Also, misstates the evidence.   In fact, the Class D Examination – Investigator's narrative states, "A urine test showed positive   for   amphetamines;   however, also indicated the result might be a false positive   due   to   the   decedent's prescription   of   Provigil."   Detective Chilson   attached   this   evidence   as Exhibit B to the August 2009 Search Warrant Affidavit, for the magistrate's review.   (See   also,   Defendants' objections   to   Plaintiff's   evidence, objection no. 10) Evidence: Search Warrant Affidavit at p. 59, ¶ 4 attached as Exhibit 8; Class D Examination at p. 76, ¶ 4, attached as Exhibit 9. |
| 46.   In July 2009, Dr. Feldman never told Det. Chilson that Rina Klein had a large quantity prescription for Percodan. | 46.   Objection:   Relevance.   (FRE 402) Any claims arising out of the 2009 Search Warrant are barred by the statute |

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| Evidence:  *See* Plaintiff Exh. 40, Pp. 9, Paragraph 8. Supplemental Report No. 0001 | of limitations.   Notwithstanding, Undisputed.   There is no reference to Percodan in the July 2011 or December 2011 Search Warrant Affidavits. (See also,   Defendants' objections to Plaintiff's evidence, objection no. 10) |
| 47.    Chilson did not obtain a complete copy of the Rina Klein medical records from Cedars for two (2) years after the August 2009 Search Warrant.<br>Evidence:    *See* Plaintiff Deposition Excerpts of D. Chilson, 283:7-20. | 47.    Objection:    Relevance. (FRE 402)  It misstates the testimony.   The cited testimony reflects that Chilson stated he had a set of the medical records earlier but did not know whether they were complete so he subpoenaed them from Cedars. |
| 48.    Before December 2011, Det. Chilson knew Rina Klein's Codicil was found not to be a forgery by the Honorable Reva G. Goetz of the Los Angeles County Probate Court yet he falsely claimed that it was forged in his December 2011 Search Warrant affidavit.<br>Evidence:    *See* Plaintiff Exh. 48, Page 135. | 48.    Objection:    Lacks foundation. (FRE 104) Argumentative, this is not a statement of fact.  Mischaracterizes the cited evidence in support of the purported fact.   Exhibit 48 is only a tentative statement of decision, which states, "The codicil is not to be admitted."  It goes on to state under the "Orders", "Codicil dated November 19, 2008 is not admitted pursuant to stipulation."  There is no discussion in this tentative ruling about whether the codicil is a forgery. The section cited by Plaintiff only discusses the authenticity of a letter written by Rina. |

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| | Furthermore, under the "Findings" section, it states, "The court finds that the testimony of Dr. Edward Feldman is credible. He testified that Rina confided in him about her unhappiness in the marriage and that he provided marital counseling to Rina and Gary in late summer 2008." Evidence: Tentative Statement of Decision at p. 132, ¶2, no. 2, p. 133, Section I(A)(1)(a), p. 139, Section II(A)(1)(D) attached as Plaintiff's Exhibit 48. |
| 49.   In January 2010, Chilson knew that Deputy Medical Examiner Dr. Ribe opined that the cause of Rina Klein's fatal seizure episode may have resulted from Rina's heart defect (mitral valve prolapse) and a mix of prescription medications, not poison which was omitted from his July 2011 and December 2011 affidavits. Evidence: *See* Plaintiff Exh. 44, Page 68, Paragraph 2. Strychnine including any other poison was never detected by the coroner using more sensitive tests than the NMS. *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 221, Note Entry Dated 11/24/2010. | 49.   Objection: Lacks foundation. (FRE 104) Lacks personal knowledge. (FRE 602) Calls for speculation. Further, this mischaracterizes and misstates the evidence. There is no reference in the Autopsy report that Rina's fatal seizure episode may have been the combined result of her mitral valve prolapse and a mix of prescription medications. The Coroner's Office concluded that Rina Klein's cause of death was "Cause Not Established". Additionally, there is no reference to the Los Angeles County Coroner's lab using more sensitive testing equipment |

66

| | |
|---|---|
| | than the NMS. (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) |
| | Evidence: Autopsy Report at p. 78, subd. (c), attached as Exhibit 10. |
| 50.   In January 2010, Chilson knew strychnine, including any other poison, was not detected by the Los Angeles County Coroner's lab which used more sensitive testing equipment than the NMS and this material fact was omitted from the July 2011 and December 2011 affidavits that Det. Chilson submitted to the Magistrates in this case. | 50.   Objection: Lacks foundation. (FRE 104) Lacks personal knowledge. (FRE 602) Calls for speculation. Further, this mischaracterizes and misstates the testimony.   There is no reference to the Los Angeles County Coroner's lab using more sensitive testing equipment than the NMS. Furthermore Detective Chilson reported in the July 2011 Affidavit that NMS test results came back positive for strychnine but could not be duplicated. The December 2011 Search Warrant Affidavit is silent on the subject of NMS performing testing to detect for toxins.   (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) |
| Evidence:   *See* Plaintiff Exh. 44, Page 68, Paragraph 2.   Strychnine including any other poison was never detected by the coroner using more sensitive tests than the NMS.   *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 221, Note Entry Dated 11/24/2010. | Evidence:   June 2011 Search Warrant Affidavit, p. 102, lines 26-29, attached as Exhibit 11;   December 2011 Search Warrant Affidavit at p. 126-139;   NMS Phone Log History Report, p. 86 |

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

| | Exhibit 45. |
|---|---|
| 51.   On December 29, 2010 Chilson knew that the National Medical Service (NMS) lab never found the presence of strychnine in Rina Klein's liver tissue and Det. Chilson omitted this material fact from his July 2011 and December 2011 search warrant affidavits for Klein's residence to the Magistrates.<br><br>Evidence:  Klein Exh. 45, Page 87. On 11-30-2010, Det. Chilson called the Coroner and he provided an additional toxicology report with "Stychnine being reported Not detected."  *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 221, Note Entry Dated 11/24/2010. | 51.   Objection:   Lacks   foundation. (FRE 104) Lacks personal knowledge. (FRE 602) Calls for speculation. Mischaracterizes and misstates the evidence. The NMS lab did indeed find evidence of strychnine in Rina's bodily tissue and Dr. Ribe at the Coroner's Office acknowledged this. (See also, Defendants' objections to Plaintiff's evidence, objection no. 9)<br><br>Evidence: Plaintiff Ex. 45, pp. 86-87; Ex. 55, p. 221; Depo of J. Ribe at 673:22-25, attached as Exhibit 56. |
| 52.   The   Beverly   Hills   Police Department Internal Affairs Unit did not interview or otherwise contact Detective Chilson to investigate the Gary Klein misconduct complaints about the handling of the Rina Klein investigation.<br><br>Evidence:  *See* Plaintiff's Excerpts from the Deposition of D. Chilson, 117:12-118; 119:3 to 120:20. | 52.   Undisputed.   However, this does not mean that Detective Chilson was not interviewed regarding his role in the Klein investigation.   Detective Chilson was in fact interviewed.<br><br>Evidence:   December   2011   Search Warrant Affidavit, p. 5, lines 24-33, p. 6, lines 1-9, attached as Exhibit 12. |
| 53.   At the direction of Chief Snowden, the   Los   Angeles   County   Coroner, | 53.   Objection:   Lacks   foundation. (FRE 104) Relevance. (FRE 402) |

1102215.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| Detectives Chilson and Coulter and Detective Sergeant Publicker made a presentation to DME Ribe regarding the exhumation of Rina Klein's body.<br><br>Evidence:  *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 216, Case Note Entry Dated 7/28/2009. | Inadmissible hearsay. (FRE 802) Misstates the testimony. Plaintiff's evidence does not support this fact. Lacks personal knowledge. (FRE 602) Calls for speculation. It is undisputed that Detectives Chilson and Coulter and Detective Sergeant Publicker made a presentation to DME Ribe. (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) |
| 54. Det. Publicker was never interviewed by the Beverly Hills Police Department in response to Klein's internal affairs complaint.<br><br>Evidence:  *See* Plaintiff's Excerpts from the Deposition of M. Publicker, 76:14-25 to 77:1-22. | 54. Objection: Misstates the testimony. Plaintiff's evidence does not support this fact. Undisputed, however this does not mean that Detective Sergeant Publicker was not interviewed regarding his role in the Klein investigation.<br><br>Evidence: Declaration of Chief Snowden at 2:19-3:1, ¶9. |
| 55. On July 28, 2009, Det. Chilson, along with Sergeant Det. Publicker met with the Los Angeles County Coroner to discuss their theory of the case against Gary Klein.  They believed Gary Klein had colluded with Dr. Metzger to prescribe medication to Rina Klein that would interact negatively with Rina's other medications and cause her death. | 55. Objection: Relevance. (FRE 402) None of this information is contained within the affidavits at issue in this case. Also, lacks foundation. (FRE 104) Inadmissible hearsay. (FRE 802) Lacks personal knowledge. (FRE 602) Calls for speculation. (See also, Defendants' objections to Plaintiff's evidence, objection no. 9) |

1102215.1

| | |
|---|---|
| Evidence:  *See* the Los Angeles County Coroner Case Notes, Plaintiff Exh. 55, Page 216, Case Note Entry Dated 7/28/2009. | |
| 56.    Since the closure of the homicide investigation of Rina Klein, Chilson is no longer a detective.<br><br>Evidence:  *See* Plaintiff's Excerpts from the Deposition of D. Chilson, 55:20-22. | 56.    Objection:  Relevance.  (FRE 401)  Misstates  the  testimony. Plaintiff's evidence does not support this fact.  Undisputed that D. Chilson is no longer a detective. The testimony quoted  does  not  indicate  that  the homicide investigation of Rina Klein has been closed. |
| 57.    Det. Chilson was never demoted or transferred  out  of  his  department  as detective  as  a  result  of  Klein's  internal affairs complaints.<br><br>Evidence:  *See* Plaintiff's Excerpts from the Deposition of D. Chilson, 119:7-13<br><br>("Q.   Were you ever demoted because of Gary Klein's complaints?<br><br>A.     No.<br><br>Q.     Were you ever transferred from the crimes against persons unit as a result of Gary Klein's complaints?<br><br>A.     No.). | 57.    Undisputed. |
| 58.    Det.  Chilson  is  no  longer  a Detective  with  the  Beverly  Hills  Police Department, he is now a Beverly Hills | 58.    Objection: Relevance. (FRE 402) Argumentative  to  the  extent  Plaintiff seeks  to  imply  causality.  (See  also, |

WOODRUFF, SPRADLIN<br>& SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

1102215.1

| | |
|---|---|
| traffic cop.<br><br>Evidence:  *See* Plaintiff's Excerpts from the Deposition of D. Chilson, 47:21-24; 49:16-28; 49-20-22. | Defendants' objections to Plaintiff's evidence, objection no. 11) Without waiving these objections, Undisputed. |
| 59.    During the August 3, 2009 search of Klein's residence and vehicles, the Beverly Hills Police Department, including, Det. Chilson, did not provide a copy of the August 3, 2009 Search Warrant to Klein because it was under seal.  Klein finally received a copy of the August 3, 2009 search warrant at the end of March 2015 when counsel for Defendants, Anna Salusky produced all of the search warrants related to this case to Klein's criminal attorney, Mr. Mark Werksman.  Klein had no reason to suspect that Defendants had engaged in any wrongful conduct, let alone, engaged in wrongful conduct that violated his civil rights.<br><br>Evidence:  Declaration of G. Klein, ¶3, 2:15-19, ¶4, 2:20-25; ¶5, 2:26 to 3:1-3. | 59.    Objection: Relevance. (FRE 402) California rules regarding accrual of a cause of action do not apply to federal claims in Federal Court.  (See also Defendants' objections to Plaintiff's evidence, objection no. 12) Without waiving these objections, Undisputed to the extent that Plaintiff was not provided with a copy of the August 3, 2009 Search Warrant until March 2015. |
| 60.    Supervising Detective Publicker believed that Det. Chilson should have included the fact that the Probate Court found no forgeries on the codicil in his December    2011    Search    Warrant | 60.    Objection:  Lacks Foundation. (FRE 104) Assumes facts not in evidence.  Misstates the cited testimony. Michael Publicker responded to a hypothetical question that assumed the |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| | |
|---|---|
| Affidavit.<br><br>Evidence: *See* Plaintiff's Excerpts from the Deposition of M. Publicker, 74:11 to 75:18. | probate court found no forgeries on the codicil. In fact, no evidence has been offered by Plaintiff to support such a finding was ever made by the Probate Court. (See also, Defendant's Response to Plaintiff's Statement of Additional Material Facts No. 48 and Defendants' objections to Plaintiff's evidence, objection no. 13) |
| 61. Supervising Detective Publicker believed that Det. Chilson should have included in his December 2011 Search Warrant Affidavit the fact that Rina Klein's dialysis was done on the recommendation of her treating physicians.<br><br>Evidence: *See* Plaintiff's Excerpts from the Deposition of M. Publicker, 60:24 to 61:4. ("Q. And do you believe that Detective Chilson should have also included in this affidavit the information that, in fact, the dialysis, as we're calling it, was done on the recommendation of her treating physicians?<br><br>A. He could have included it.") | 61. Objection: Relevance. (FRE 401) Misstates the cited testimony. Plaintiff's evidence does not support this fact. Undisputed that Michael Publicker testified that Detective Chilson *could* have included in his Affidavit that dialysis was done at the recommendation of Rina's treating physician. (See also, Defendants' objections to Plaintiff's evidence, objection no. 14) |
| 62. Det. Publicker believed that Det. Chilson should have included the fact that Gary Klein did not have his own | 62. Objection: Relevance. (FRE 401) Misstates the cited testimony. Plaintiff's evidence does not support |

WOODRUFF, SPRADLIN & SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

1102215.1

| | |
|---|---|
| accountant but was using the Pakula Family accountant in his July 2011 Search Warrant Affidavit. Evidence:  *See* Plaintiff's Excerpts from the Deposition of M. Publicker, 103:8-13. | this fact.   Undisputed that Michael Publicker testified that Detective Chilson could have included in his Affidavit that Gary Klein did not have his own accountant and was using the Pakula family accountant. (See also, Defendants' objections to Plaintiff's evidence, objection no. 15) |
| 63.   There   were   no   exigent circumstances requiring Det. Chilson to obtain the August 2009 Search Warrant so quickly. Evidence:  *See* Plaintiff's Excerpts from the Deposition of M. Publicker, 124:16-20. | 63.   Objection: Relevance. (FRE 402) Any claims made regarding August 2009 search warrant affidavit are barred by the statute of limitations. |
| 64.   Klein "very strongly wanted a full autopsy" and it was his and Rina Klein's Rabbi, Rabbi Steven Weil that instructed Klein and the Los Angeles County Coroner to perform a limited Class "D" Autopsy. Evidence:   *See*   Plaintiff's   Exh.   42, Transcript   of   Daniel   Chilson's   (DC) interview with Rabbi Steven Weil (SW), Dated August 13, 2009, 1:10-15. ("SW: Um on that case and Gary originally, very strongly wanted a full autopsy and I was the one that pushed | 64.   Objection:   Relevance.   (FRE 402)   Misstates   the   cited   testimony. Plaintiff's evidence does not support this fact. On August 4, 2009, Gary Klein   informed   Detective   Chilson during   a   voluntary   interview   that   he objected to an autopsy being performed and communicated with an investigator from   the   Coroner's   Office   to   request that it be as minimal as possible, if it was done at all.   Gary Klein also told Detective Chilson that he asked Rina's mother,   Julie   Pakula,   to   talk   to   Anita |

1102215.1

1  him. I'm his rabbi, I was Rina's rabbi.
2  You know in Jewish law I said, look by
3  just taking, extracting seminal fluids you
4  know in his blood, urine, hypothalamus
5  glands, and we've worked with Dr.
6  Lakshmanan and with the LA County
7  Coroner's office so many times. In fact I
8  called up Rabbi Goldenberg after asking
9  Gary to do it that way.
10 DC:   Okay.
11 SW:   That's   why   we   asked   for   the
12 limited autopsy. I take full responsibility.
13 DC:   Okay.
14 SW:   And you know, you know, I will,
15 please feel free if you want I can share to
16 you face to face. I, you can see that I'm
17 telling and sincere about that.
18 DC:   No, I get.
19 SW:   In that, Chief of Police Snowden
20 knows me very well. Now, you know, his,
21 you know what, what her family is doing,
22 okay you know I'm not here to sit and
23 judge them. But, you know, to even think
24 for a second that Gary was trying to hide
25 something   by   not   asking   for   a   full
26 autopsy, I take *full responsibility* of that.
27 DC:   Okay.
28 SW:   *110 percent*. Because I can tell you,

about   avoiding   an   autopsy.   Helene
Klein (sister of Gary Klein) testified
that in the hospital, Gary did not want
her body cut up. (See also, Defendants'
objections   to   Plaintiff's   evidence,
objection no. 4)
Evidence:   Interview   transcript   of   G.
Klein on August 4, 2009, Part 2 of 2,
680:28-682:12, 683:13-18, attached as
Exhibit 58; Audio of interview of G.
Klein at 4:55 through 9:11 and 10:52
through   11:07,   attached   as   Exhibit 1;
Depo H. Klein at 413:1:414:4, attached
as Exhibit 21.

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

| | |
|---|---|
| I could testify in a court of law, I know what his original intentions are and it took over about a 36-hour period.  I said, look Gary is this what we want to do to her.  You know, she suffered enough.   You know, again if Dr. Lakshmanan's office feels it's a full autopsy is necessary, it doesn't matter what I say as the rabbi they're gonna do it. And you know, we have the respect for them." | |
| 65.    Det. Chilson did not attempt to corroborate, or test the informants Anita Pakula's and Julie Pakula's statements that Rina told them three weeks prior to her death that Klein said he could make Rina Klein *"go away and no one would know how she died*" (the alleged "Death Threat").<br><br>Evidence:  *See* Plain. Exh. 46, Page 101, ¶4:16-22 & Page 102, ¶3:12-15.<br><br>*See* Plaintiff's Deposition Excerpts of Daniel Chilson, 104:3-14.<br><br>During Det. Chilson's deposition he was asked several questions regarding the Pakula's failure to report the alleged death threat until several weeks after Rina died as follows:<br><br>("Q.  And Anita Pakula is a medical | 65.    Objection: Relevance. (FRE 402)  Misstates the testimony.  The evidence cited does not support this purported fact.  Klein cites to no evidence that Chilson had any reason to question the credibility of Anita Pakula or Julie Pakula. |

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| doctor, isn't she? | |
| A. Yes. | |
| Q. And did you consider that noteworthy to your investigation, that a medical doctor failed to report a death threat about her sister to the treating physicians at Cedars? | |
| A. No. | |
| Q. Did you find it suspicious as to the credibility of Julie Pakula that she only told you about this weeks after her daughter's death? | |
| A. No." | |
| 66.    Det. Chilson did not care that his informant Julie Pakula had an axe to grind with Gary Klein or consider her motivations.<br><br>Evidence:    *See* Plaintiff's Deposition Excerpts of Daniel Chilson, 88:17 to 89:5; 89:14 to 90:1-11. | 66.    Objection: Misstates the testimony.    Argumentative regarding "did not care" and "axe to grind". Plaintiff's evidence does not support this fact. Misstates the cited testimony. Detective Chilson testified that in December 2011 he understood Julie Pakula to be distraught over the death of her daughter.  Detective Chilson further testified that he did not think Julie Pakula cared for Mr. Klein.<br><br>Evidence:    Plaintiff's Deposition Excerpts of D. Chilson, 88:17-89:5; 89:14 to 90:1-11. |

1102215.1

| | | |
|---|---|---|
| 1 | 67.  Det. Chilson knew Anita Pakula was a medical doctor who did not mention anything to the Cedars doctors regarding the alleged Death Threat and no mention of the alleged Death Threat was made until several weeks after Rina Klein had died.<br><br>Evidence:   *See* Plaintiff's Deposition Excerpts of Daniel Chilson, 88:17 to 89:5; 89:14 to 90:1-11. | 67.   Objection: Relevance. (FRE 402) Misstates the testimony.  The evidence cited does not support this purported fact.  Klein cites to no evidence that Chilson had any reason to question the credibility of Anita Pakula or Julie Pakula. |
| 11 | 68.   Any reasonable officer would have considered the alleged Death Threat wholly unreliable.<br><br>Evidence:  Declaration of Roger A. Clark, Page 8, ¶26:5-12. | 68.   Objection: Improper conclusion, not an evidentiary fact. Lacks foundation. (FRE 104)   Relevance. (FRE 402) (See also, Defendants' objections to Plaintiff's evidence, objection no. 16) |
| 17 | 69.   Det. Chilson never interviewed Dr. Alan Metzger and some other additional witnesses because he believed them to be 'friendly' to Gary Klein.<br><br>Evidence:  Plain. Exh. 54, Page 212, ¶2. ("Dr. Fajardo asked if I (Det. Chilson) had interviewed Dr. Metzger.  I (Det. Chilson) told Dr. Fajardo that for investigative reasons, I had not interviewed Dr. Metzger and some additional witnesses believed to be <u>friendly</u> to Gary Klein.") Emphasis added. | 69.   Objection: Lacks foundation. (FRE 104)   Relevance. (FRE 402) Inadmissible hearsay. (FRE 802) Improper conclusion. (See also, Defendants' objections to Plaintiff's evidence, objection no. 17) |

WOODRUFF, SPRADLIN & SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

1102215.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | |
|---|---|
| 70. "Dr. Feldman told Lt. Seeger that when he was at the ER, he glanced at a bag of prescription medications that the paramedics or Gary Klein had brought to the hospital. ... All of these medications seemed consistent to him, *but a large quantity prescription for Percodan did not*." <br><br> Evidence: (Plain. Exh. 41, Page 26, ¶6 to Page 27, ¶1.) | 70.   Objection:   Relevance.   (FRE 402) Any claims made regarding the August 2009 Search Warrant Affidavit are barred by the statute of limitations. There is no reference to Percodan in the June 2011 or December 2011 Search Warrant Affidavits. <br><br> Evidence: June 2011 Search Warrant Affidavit, attached as Exhibit 11; December 2011 Search Warrant Affidavit, attached as Exhibit 12. |
| 71. "Gary, who is not a physician, insisted that Rina be put on dialysis. Anita said she was so tired and worn down, she agreed.  Anita now regretted the decision and believed the dialysis may have been an effort by Gary to have Rina's blood cleansed of any evidence of intoxicant". <br><br> Evidence:  *See* Plain. Exh. 41, Page 30, ¶5. | 71.   Objection:   Relevance.   (FRE 402) Any claims made regarding August 2009 Search Warrant Affidavit are barred by the statute of limitations. |
| 72. "Gary insisted on the Doctors doing dialysis on Rina to wash the poisons out of her to see if it could reverse some of the damage and since she was having kidney failure...." <br><br> Evidence:  *See* Plain. Exh. 39, ¶1. | 72.   Undisputed. |

1102215.1

| 73.   "Gary maintained he did not want Rina's body cut up or mutilated". Evidence:   *See* Plain. Exh. 41, Page 28, ¶5. | 73.   Undisputed. |
|---|---|

DATED:  July 27, 2015                              WOODRUFF, SPRADLIN & SMART, APC


By: s/ Anna R. Salusky _____
    DANIEL K. SPRADLIN
    M. LOIS BOBAK
    ANNA R. SALUSKY
    Attorneys   for   Defendants   CITY   OF BEVERLY   HILLS,   DANIEL   CHILSON, MICHAEL PUBLICKER, CHIEF DAVID L. SNOWDEN

1102215.1

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF, SPRADLIN & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On July 27, 2015, I served the foregoing document(s) described as **COMBINED STATEMENT OF FACTS**

☐    by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐    **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒    **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐    **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐    **(BY FACSIMILE)** I caused the above-referenced document to be transmitted to the interested parties via facsimile transmission to the fax number(s) as stated on the attached service list.

☒    (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on July 27, 2015, at Costa Mesa, California.

s/ Laura F. Perez
LAURA F. PEREZ

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

## GARY KLEIN v. CITY OF BEVERLY HILLS, et al.

**ASSIGNED TO THE HONORABLE JOHN F. WALTER**
**COURTROOM 16**
**ASSIGNED TO MAGISTRATE JUDGE CHARLES F. EICK**
**COURTROOM 20**

**USDC, CENTRAL DISTRICT OF CALIFORNIA**
**CASE NO:  CV13-00110 JFW (VBKx)**

## SERVICE LIST

Michael A.J. Nangano Esq.                    Attorneys for Plaintiff
Michael A.J. Nangano, A Law Corporation      **GARY KLEIN**
555 W. Fifth Street, Suite 3100
Los Angeles, CA  90013
Telephone:  (213) 533-4285
Facsimile:  (213) 232-3252
Email:  mnangano@lacounsel.com

Daniel J. Yourist, Esq.                      Associate Counsel for Plaintiff
Bradley J. Yourist, Esq.                     **GARY KLEIN**
YOURIST LAW CORPORATION, APC
11111 Santa Monica Blvd., Suite 100
Los Angeles, CA  90025-3333
Telephone:  (310) 575-1175
Facsimile:  (310) 575-1167
Email:  djy@youristlaw.com
        bjy@youristlaw.com

6/26/15

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1102215.1

81